**NATIONAL FARMERS ORGANIZATION, Appellant,**

v.

**BARTLETT AND COMPANY, GRAIN, Appellee.**

**No. 76–1803.**

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1977.

Decided Sept. 6, 1977.

---

Jim Tom Reid, Kansas City, Mo., argued and filed appendix and briefs for appellant.

Michael W. Lerner, Kansas City, Mo., argued and filed brief for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

This is a diversity action brought by the National Farmers Organization (hereinafter Seller) against Bartlett and Company, Grain (hereinafter Buyer) to recover an alleged balance due, in the stipulated amount of $18,441.62, on the price of grain sold and delivered under four of a series of fourteen contracts between the parties. The Buyer admits that the $18,441.62 was withheld from the total payment otherwise due but claims by way of setoff that the stated sum was properly withheld as damages due it by virtue of the Seller's alleged breach or anticipatory repudiation of all fourteen contracts. The pertinent facts were largely stipulated, and the cause was tried to the district court sitting without a jury. The court, agreeing with the Buyer that the Seller had breached or anticipatorily repudiated all fourteen contracts, rendered judgment for the Buyer. We affirm.

I.

Prior to January 30, 1973, the parties had entered into forty-five contracts for the sale of grain. Of these contracts, thirty-one were performed in full by both parties and are not in issue. The remaining fourteen, which are the subject of this lawsuit, are summarized in the following table.

Table 1.

| Contract Number | Date of Execution (all 1972) | Quantity (bushels) | Price (per bu.) | Delivery Dates |
|---|---|---|---|---|
| 22868 | Aug. 5 | 40,000 | $1.80 | Dec. 1972 |
| 996 | Aug. 7 | 5,000 | 1.68 | Aug. 7–Sept. 22, 1972 |
| 1338 | Sept. 6 | 3,400 | 1.97 | Feb.–Mar., 1973 |
| 1366 | Sept. 11 | 10,000 | 1.96 | Jan. 15–Mar. 15, 1973 |
| 1371 | Sept. 11 | 12,000 | 1.96 | Jan. 15–Mar. 15, 1973 |
| 1380 | Sept. 11 | 5,400 | 1.99 | Jan. 15–Mar. 15, 1973 |
| 1389 | Sept. 12 | 20,000 | 1.98 | Dec. 1972 |
| 1400 | Sept. 13 | 750 | 2.035 | Jan. 15–Mar. 15, 1973 |
| 1425 | Sept. 16 | 5,500 | 1.86 | June–Aug., 1973 |
| 1575 | Oct. 12 | 10,000 | 1.87 | June–Aug., 1973 |
| 7415 | Oct. 17 | 30,000 | 1.155 | Oct.–Dec., 1972 |
| 1729 | Nov. 13 | 15,000 | 1.87 | June–Aug., 1973 |
| 1824 | Nov. 29 | 13,000 | 2.26 | Dec. 1972 |
| 1845 | Dec. 4 | 2,700 | 2.34 | Jan. 1973 |

Contract No. 7415 was for the sale of corn; each of the others was for the sale of wheat.

The controversy over the above contracts began in December 1972. As of December 1, the only contract on which the delivery date had passed was No. 996; although the September 22 last delivery date had long since expired, 1672 of the 5,000 bushels called for under the contract remained undelivered. Deliveries were due in December on Nos. 22868, 1389, 7415 and 1824. At the end of the month, none of the 40,000 bushels had been delivered on No. 22868, 16,480 of the 20,000 bushels had been delivered on No. 1389, 19,364 of the 30,000 bush-

els had been delivered on No. 7415, and 8,125 of the 13,000 bushels had been delivered on No. 1824. Additional deliveries on these four contracts, although late, were tendered and accepted in January 1973; by the end of January, 31,725 of 40,000 bushels remained undelivered on No. 22868, 397 of 20,000 bushels remained undelivered on No. 1389, 8,049 of 30,000 bushels remained undelivered on No. 7415, and 648 of 13,000 bushels remained undelivered on No. 1824. In addition, none of the 2,700 bushels due in January under No. 1845 were delivered. The eight contracts not mentioned above in this paragraph had last delivery dates subsequent to January 31, 1973. No deliveries were ever made on any of these contracts, except that 3,943 of 12,000 bushels due no later than March 15 under No. 1371 were delivered in January. On several occasions during the month of January, prior to January 26, the Buyer had given notice to the Seller that the Seller had not completed delivery on certain contracts by the delivery dates designated in the contracts.

Beginning early in December 1972 and continuing throughout January 1973 the Buyer "was retaining some of the purchase price of grain actually delivered as protection against realized or potential loss caused by failure on the [Seller's] part to perform all contracts not yet fully performed."[1] On several occasions during December and January the Seller made verbal demands for the purchase price of grain already delivered.

On or about January 26, 1973, the Seller notified the Buyer that the Seller "was not going to deliver any grain to [Buyer] on any of the 14 outstanding contracts between the parties unless and until [Buyer] paid [Seller] a substantial amount of money due on deliveries already made as of that date on contracts Nos. 22868, 1371, 1389 and 1824."[2] The Seller did in fact suspend performance on all fourteen contracts as of January 27. Thereafter, no grain was ever tendered under any of the contracts.

It is the above communication which the Buyer elected to treat as an anticipatory repudiation of the contracts not yet due. On January 30, the Buyer sent the Seller the following telegram (punctuation supplied in part):

AS OF TODAY'S MARKET CLOSE WE ARE BRINGING ALL OUTSTANDING CONTRACTS WE HAVE WITH YOUR OFFICE TO CURRENT MARKET PRICE, NAMELY, OUR CONTRACTS 996, 1338, 1366, 1371, 1380, 1425, 1575, 1729, AND 22868. SETTLEMENT WILL BE FORTHCOMING.

On or about January 30–31, the Buyer mailed a debit memo and two credit memos to the Seller. The numerical accuracy of the figures used and calculations made in these memos is stipulated.[3] These memos reflect a balance due the Seller for deliveries made under contracts Nos. 22868, 1371, 1389, and 1824 of $72,894.89 and a balance due the Seller for deliveries made under contract No. 7415 of $1,919.50, for a total balance due of $74,814.39.

---

1. Stipulation 34. The precise import of this stipulation is disputed. The Seller maintains the Buyer withheld payment as protection against the anticipated failure on the Seller's part to deliver grain as contracted for in all fourteen contracts. The Buyer appears to maintain that the payments, which were withheld on contracts Nos. 22868, 1371, 1389 and 1824, were only withheld to cover past losses on Nos. 22868, 996, 1389 and 1845. Although we think the Seller's interpretation of the stipulation more nearly accords with the words used, under the view we ultimately take of the case the reasons for the Buyer's withholding payment are irrelevant.

2. Stipulation 26.

3. Stipulation 13. The stipulation did reserve to the Seller, *inter alia*, the right to contest "the defendant's right to use certain prices as applicable market prices for the measure of damages." On this appeal the Seller does dispute the defendant's right to use the market prices which were used. The Seller's contention in this regard flies in the face of stipulation 40, filed some seven months after Stipulation 13. Stipulation 40 reads in full:

If the legal issues are found in favor of defendant, plaintiff does not contest the measure of damages as determined, in whole or in part, by defendant in its credit and debit memos (Exhibits BB, CC, and DD). Stipulation No. 13 above is hereby superseded to the extent it is inconsistent with this stipulation.

The same credit and debit memos claimed setoffs on thirteen of the fourteen contracts,[4] in each case by virtue of the Seller's past breach or alleged anticipatory repudiation of the particular contract. The claimed setoffs were as follows:

Table 2.

| Contract No. | Undelivered Quantity (bushels) | Difference in Market and Contract Prices (see note 3, supra) | Claimed Setoff |
|---|---|---|---|
| 22868 | 31,732 | $ .785 | $24,909.62 |
| 996 | 1,673 | .67 | 1,154.37 |
| 1338 | 3,400 | .40 | 1,360.00 |
| 1366 | 10,000 | .41 | 4,100.00 |
| 1371 | 8,057 | .41 | 3,303.37 |
| 1380 | 5,400 | .38 | 2,052.00 |
| 1389 | 405 | .39 | 157.95 |
| 1400 | 750 | .335 | 251.25 |
| 1425 | 5,500 | .25 | 1,375.00 |
| 1575 | 10,000 | .24 | 2,400.00 |
| 7415 | 8,770 | .125 | 1,096.25 |
| 1729 | 15,000 | .24 | 3,600.00 |
| 1845 | 2,700 | .03 | 81.00 |
| | | Total | $45,840.81 |

The Buyer, deducting the claimed setoff of $45,840.81 from the net balance due of $74,814.39, sent the Seller a check dated February 9 for the $28,973.58 difference. The check was subsequently paid.

The Seller, one day after receiving the January 30 telegram, informed the Buyer that, while it consented to cancellation of contracts Nos. 22868 and 996, it did not recognize and would not agree to cancellation of contracts for future delivery. It is now stipulated that the claimed setoffs shown in Table 2 were proper as to all contracts with last delivery dates of January 31 or earlier, viz., Nos. 22868, 996, 1389,

1845 and 7415.[5] Accordingly, at issue herein is the propriety of claimed setoffs, totaling $18,441.62, on those contracts having last delivery dates subsequent to January 31, viz., Nos. 1338, 1366, 1371, 1380, 1400, 1425, 1575 and 1729.[6] The resolution of this issue turns on the question whether the Seller's January 26 communication constituted an anticipatory repudiation of these contracts.

Before turning to the legal issue presented, we mention one additional fact not expressly stipulated or expressly found by the district court. It is quite clear from the stipulations that as of January 26 a very

**4.** No setoff was claimed on No. 1824.

**5.** There is no express stipulation to this effect with respect to No. 7415. However, stipulation 33 provides:

> On or about February 15, 1973, in a telephone conversation, [Seller] put [Buyer] on notice that it would honor the cancellation of overdue contracts but not harvest 1973 contracts.

The last delivery date on No. 7415 was December 1972, and the contract was accordingly overdue on February 15. In any event, it is clear the Seller raises no claim on No. 7415. If the expressly conceded setoffs on Nos. 22868, 996, 1389 and 1845 are deducted from the total $45,840.81 claimed setoff shown in Table 2, the disputed setoffs remaining would total $19,-

537.87, which exceeds the $18,441.62 stipulated amount in controversy by $1,096.25, precisely the claimed setoff on No. 7415.

**6.** Issue is raised by the Buyer that the Seller consented to the cancellation of all contracts except harvest 1973 contracts, viz., Nos. 1425, 1575 and 1729. The contention is based on stipulation 33, quoted supra n.5. If this contention were correct, the Seller would of course be precluded from contesting the claimed setoffs on Nos. 1338, 1366, 1371, 1380 and 1400. However, each of the last-mentioned contracts had a last delivery date in March 1973 and was accordingly not overdue on February 15. Thus, stipulation 33 does not speak of these contracts, and they remain in issue.

substantial sum, over and above the amount of damages by then sustained by the Buyer as a consequence of the Seller's past defaults, was due the Seller for deliveries already made under contracts Nos. 22868, 1371, 1389 and 1824,[7] and a very substantial portion of that sum was not only due but past due.[8]

## II.

■ The question tendered to us for decision—whether the Seller's communication of January 26 constituted an anticipatory repudiation of the contracts on which performance was not yet due—is a difficult and close one. Ultimately, its resolution is governed by Section 2–610 of the Uniform Commercial Code (Mo.Ann.Stat. § 400.2–610 (Vernon 1965)) and the common law. However, as the parties readily concede, neither the Code language nor the caselaw of any jurisdiction provides a definitive answer.

Before examining the tendered question directly, we find it useful for the purpose of comparison to consider what the Seller clearly could have done on January 26 under Uniform Commercial Code § 2–609 (Mo. Ann.Stat. § 400.2–609 (Vernon 1965)) and what it clearly could not have done on January 26 under Uniform Commercial Code § 2–612 (Mo.Ann.Stat. § 400.2–612 (Vernon 1965)).

■ Uniform Commercial Code § 2–609(1) provides in part: "When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." Comment 3 to this section states in part:

Under commercial standards and in accord with commercial practice, a ground for insecurity need not arise from or be directly related to the contract in question. . . .

Thus a buyer who falls behind in "his account" with the seller, even though the items involved have to do with separate and legally distinct contracts, impairs the seller's expectation of due performance.

The example just cited conforms precisely to the facts before us. Plainly, the seller could have availed itself of a Section 2–609 remedy on January 26. Equally plainly, however, it did not do so.[9]

■ Uniform Commercial Code § 2–612(3) provides in part: "Whenever nonconformity or default with respect to one or more installments substantially impairs the

---

**7.** At least $65,877.77 was due on the four contracts as of January 26. This figure represents the $72,894.89 due on January 30–31 less the contract price of certain deliveries made on Nos. 22868 and 1389 on January 27. The total damages sustained by the Buyer on Nos. 22868, 996, 1389, 7415 and 1845 (assuming the Buyer could claim a breach on No. 1845 on January 26) are stipulated at $27,399.19 (from Table 2). The difference between $65,877.77 and $27,-399.19, which is $38,478.58, thus represents roughly the amount due on January 26 over and above past losses sustained by the Buyer. While a number of downward adjustments should undoubtedly be made to this figure, the adjustments would not alter the conclusion stated in the text.

**8.** The four contracts had payment terms as follows: No. 22868—"each Tuesday and Friday"; No. 1371—"Cash on Delivery"; No. 1389 —"Defer Payments until January 2, 1973"; No. 1824—"Daily upon delivery by noon of the following business day". Deliveries on No. 1389 subsequent to January 2 would be governed by

Uniform Commercial Code § 2–310 (Mo.Ann. Stat. § 400.2–310 (Vernon 1965)), providing that unless otherwise agreed payment is due on delivery. Thus, in each case prompt payment was part of the contract. The Seller concedes that payment within five days was acceptable to it. Even if we assume ten days, payment for all deliveries prior to January 16 would be past due on January 26. Slightly more than $5000 worth of grain was delivered on the four contracts between January 16 and 26. All other sums due on the four contracts on January 26 were past due.

**9.** The Seller so concedes. For two reasons, the concession is a proper one. First, the communication of January 26 was not in writing. Second, the communication did not seek assurance of performance on the future contracts; it sought actual part performance on the contracts on which payment was past due.

The Buyer, we note, has also conceded that it never pursued a remedy under Section 2–609.

value of the whole contract there is a breach of the whole." Comment 6 to this section states in part:

Whether the non-conformity in any given installment justifies cancellation as to the future depends [on] . . . whether the non-conformity substantially impairs the value of the whole contract. If only the seller's security in regard to future installments is impaired, he has the right to demand adequate assurances of proper future performance but has not an immediate right to cancel the entire contract.

Although the Buyer was on January 26 substantially behind on payment on some of the contracts, in none of the contracts was time of the essence, and there is no indication that the Buyer's ability to pay was impaired. With respect to those contracts on which payments had not been withheld, at least,[10] the value of each such contract was plainly not substantially impaired as a whole on January 26, and the Seller plainly could not have cancelled those contracts on that date. Equally plainly, however, the Seller did not purport to cancel any of the contracts.[11]

With the above comments in mind, we turn to the controlling issue under Uniform Commercial Code § 2–610. The district court, acknowledging that the issue was a close one, concluded that the Seller anticipatorily repudiated the contracts with last delivery dates subsequent to January 31

when on January 26 it notified the Buyer that no grain would be delivered under any of the contracts unless and until the Buyer made a substantial payment for deliveries already made under contracts Nos. 22868, 1371, 1389 and 1824. The court reasoned:

Plaintiff's imposition on January 26 of a condition precedent that defendant perform under various independent contracts clearly amounted to a statement of intention not to perform except on conditions which went beyond each of [the contracts not yet due]. . . . A party to a contract may not refuse performance simply because the other party has breached a separate contract between them. *Northwest Lumber Sales, Inc. v. Continental Forest Products, Inc.*, 261 Or. 480, 495 P.2d 744 (1972).

Uniform Commercial Code § 2–610 provides in part: "When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . (b) resort to any remedy for breach . . . ." The Code does not articulate what constitutes an anticipatory repudiation. Comment 2 to Section 2–610, however, offers the following guidance:

It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result

10. It is doubtful that the Seller could have cancelled even those contracts on which payments had been withheld. *See Laredo Hides Co. v. H & H Meat Products Co.*, 513 S.W.2d 210 (Tex.Civ.App.1974); *Gulf Chem. & Metal. Corp. v. Sylvan Chem. Corp.*, 122 N.J.Super. 499, 300 A.2d 878 (Law Div.), *affirmed*, 126 N.J.Super. 261, 314 A.2d 73 (App.Div.1973); *Ellis Mfg. Co. v. Brant*, 480 S.W.2d 301 (Tex. Civ.App.1972).

11. The communication of January 26 was to the effect that deliveries would be withheld or suspended until the Seller received a substantial payment for past deliveries. Ignoring for the moment the complicating and ultimately decisive factor that the present case involves not one but a number of installment contracts, we point out that the distinction between renouncing a contract altogether and suspending performance until past-due counter-performance is received is a well-recognized one:

Generally, but not quite always, the seller will be privileged to suspend the succeeding delivery until the previous instalment has been paid for. . . .
A buyer is not justified in refusing to pay an instalment for the mere reason that he fears that the seller will fail to make future deliveries. Such a refusal, with accompanying factors, will justify the refusal to make further deliveries. It has been held in such a case, however, that the seller was not justified in renouncing the contract. Such a decision is correct if the actual risk of non-payment is not increased and if further performance by the seller is not thereby made more difficult. Note also, that a seller may be justified in holding up further deliveries until paid, without being justified in renouncing the contract.
3A A. Corbin, *Contracts* § 690 at 254 & 256 (1960) (footnotes omitted).

from action which reasonably indicates a rejection of the continuing obligation. . . . Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance. However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.

It is the last sentence of this Comment which is of foremost concern to us. The communication of January 26, fairly read, amounts to a statement of intention not to perform future contracts except on conditions which go beyond those contracts. Under the language of the Comment, therefore, the communication was indeed an anticipatory repudiation of the future contracts.

As a general rule, the principle embraced in the Comment's last sentence is unremarkable, unquestionably sound and in any event binding upon us by virtue of its acceptance by the Supreme Court of Missouri in *Miran Investment Co. v. Medical West Bldg. Corp.,* 414 S.W.2d 297, 302–03 (Mo. 1967) (refusal to perform except on execution of personal guarantee not required under contract held a repudiation). *See also Pittsburg-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572 (7th Cir. 1976) (applying Illinois law) (refusal to perform except on execution of personal guarantee or escrowing of payment not required under contract held a repudiation); *Westinghouse Elec. Corp. v. CX Processing Labs.,* 523 F.2d 668 (9th Cir. 1975) (applying Washington law) (refusal to deliver except at price higher than contract price held a repudiation).[12]

The general rule is not subject to variance when the stated condition derives from a separate contract or contracts—regardless of the validity of the repudiator's claim under the separate contract or contracts. It is well established that the breach of one contract does not justify the aggrieved party in refusing to perform another separate and distinct contract. 3A A. Corbin, *Contracts* § 696 (1960); Annotation, 27 A.L.R. 1157 (1923) and cases there cited.

The decision cited by the district court, *Northwest Lumber Sales, Inc., v. Continental Forest Products, Inc.,* 261 Or. 480, 495 P.2d 744 (1972), illustrates the separate contracts rule perhaps as well as any. In that case the plaintiff seller had separately contracted for a delivery of pine lumber and a delivery of 2 × 4 studs to the defendant buyer. After the pine lumber had been delivered and allegedly after payment therefor had become thirty days past due, the seller informed the buyer that it would not deliver the studs. The Supreme Court of Oregon, assuming that payment for the pine lumber had been wrongfully withheld, held: "[n]either the Uniform Commercial Code nor general contract law gives either party to a contract the right to refuse performance because the other has breached a separate contract between them." 495 P.2d at 749. Judgment was accordingly rendered for the buyer on its claimed setoff.

On the basis of the authorities cited above, we believe that the *Northwest Lumber Sales* decision was correct and that the Missouri Supreme Court, if confronted with the issue, would agree with the Oregon Supreme Court. Moreover, although the facts before us do present a closer question, we think the Missouri Supreme Court would apply the same principle here.

We may concede to the Seller that the general rule could occasionally dictate a result which for commercial reasons would be

---

12. Professor Corbin is in accord:

If one party to a contract, either wilfully or by mistake, demands of the other a performance to which he has no right under the contract and states definitively that, unless his demand is complied with, he will not render his promised performance, an antici-

patory breach has been committed. Such a breach is conditional in character, it is true; but the condition is a performance to which the repudiator has no right.

4 A. Corbin, *Contracts* § 973 at 910 (1951) (footnote omitted).

unacceptable. Perhaps in such a case the Missouri Supreme Court would decline to apply the rule. The Seller makes an argument of some merit in that regard. Two facts stand out. First, under even the Buyer's interpretation of stipulation 34, see note 1, *supra,* the Buyer was withholding payment on some contracts to cover losses on other contracts. Under Uniform Commercial Code § 2–717 (Mo.Ann.Stat. § 400.-2–717 (Vernon 1965)), it was not privileged to do so. *See Jurek v. Thompson,* 241 N.W.2d 788 (Minn.1976). Second, the Seller's communication of January 26, unlike the communication in *Northwest Lumber Sales,* did not purport to be an outright cancellation or renouncement of any obligation under any of the contracts. See note 11, *supra.* These two facts lend some credence to the Seller's contention that the January 26 communication was a justified one under the circumstances.

On the other hand, as noted previously, time was not of the essence under the contracts, and there is no indication that the Buyer's ability to pay was impaired. Measures short of suspending delivery on all contracts could have preserved the Seller's contractual right to payment. Moreover, as we have concluded above, a Section 2–609 remedy was specifically available but not used. Despite the Buyer's wrongful withholding of payment on contracts not in default, the separate identities of the various contracts were unquestionably preserved, as all deliveries and payments were separately accounted for throughout the pertinent time period. In addition the Seller, having failed to deliver 1672 bushels of wheat on contract No. 996 by the September 22 last delivery date, was the first breaching party on any of the contracts. Finally, no grain was in fact tendered under any of the contracts after January 27, even though a substantial payment was received and accepted shortly after February 9.

Taking all of the above-mentioned facts into account, we agree with the view of the district court that the Supreme Court of Missouri would find an anticipatory repudiation here. At the very least, the district court's conclusion on this question of state law in a diversity case is entitled to great deference and should be sustained. *Howard v. Green,* 555 F.2d 178, 182 (8th Cir. 1977).

The judgment appealed from is affirmed.