**DESIGN FOR BUSINESS INTERIORS, INC., Plaintiff,**

v.

**HERSON'S, INC., Defendant.**

**Civ. A. No. 85–4002.**

United States District Court, District of Columbia.

Dec. 2, 1986.

On Motion for Reconsideration Jan. 30, 1987.

John J. Fausti (Lead Counsel), Gary G. Miner, Saltman & Stevens, Washington, D.C., for plaintiff.

Everett C. Johnson, Jr., Washington, D.C., for third-party plaintiff Pinchuck.

Timothy J. Bloomfield, Washington, D.C., for Hersons.

Douglas L. Lashley, Bethesda, Md., for Park Rug.

Price O. Gielen, Baltimore, Md., for third-party defendant Roesel-Heck.

## MEMORANDUM

FLANNERY, District Judge.

This matter came before the court on a variety of motions. Plaintiff and defendant have filed cross-motions for partial summary judgment, and third-party defendants Park Rug Co. and Roesel-Heck Co. have filed motions to strike or sever the claims filed against them by defendant Herson's, Inc.

### I. *Facts*

This case began as an action on a series of contracts for furniture and other supplies between plaintiff, Design for Business Interiors, Inc. ("DBI") and defendant, Her-

son's Inc. ("Herson's"). Herson's had entered into these and other contracts in the process of decorating its new automobile showroom in Rockville, Maryland. Herson's filed an answer, counterclaim, and a cross-claim against an interior design consultant named Phyllis Pinchuck with whom Herson's had contracted to decorate the showroom. Herson's alleged that Pinchuck failed to fulfill her contract's specifications as to the furnishings and floor tiles that Herson's wanted installed in its showroom. Pinchuck counterclaimed against Herson's and also filed a third-party complaint against Park Rug Co., Inc. ("Park Rug"), the supplier of the floor tiles, alleging that any dissatisfaction that Herson's had with Pinchuck due to the floor tiles was a result of Park Rug's misrepresentations and breaches of warranty.

Under a stipulation between Pinchuck and Herson's, Herson's counterclaim against Pinchuck was dismissed, as was Pinchuck's claim against Park Rug. However, Herson's had by this time filed its own cross-claim against Park Rug, alleging the same causes of action as Pinchuck had raised in her third-party complaint. Park Rug in turn impleaded Roesel-Heck Co., Inc. ("Roesel-Heck"), a distributor of floor tiles, alleging that Herson's dissatisfaction with the floor tile installed in its showroom was due to the conduct not of Park Rug but of Roesel-Heck.

Thus, at this point, the court is presented with two essentially distinct sets of facts: the first concerns the contractual relationship between the original plaintiff, DBI, and the original defendant, Herson's, and includes warranty and payment issues as to those goods (furniture, cabinets, and partitions). The second set of facts concerns the relationship between Herson's and those companies who engaged to order, supply, and install floor tile in the new Herson's showroom, namely Park Rug and Roesel-Heck. The only apparent connection between these two sets of facts is that both are related to Herson's decoration of its Rockville showroom. The claim from which the tile-related claims arose, which was Herson's claim against Pinchuck, has now been dismissed, and the tile actions are now wholly unrelated to the facts and legal issues surrounding the initial action between DBI and Herson's.

II. *The Motions to Strike or Sever*

█ Both Roesel-Heck and Park Rug seek to have Herson's claims against them severed to be tried separately from the 'main action'—that between DBI and Herson's. Roesel-Heck moves to strike the claims against it, or in the alternative to sever these claims from the main action. In support of these motions, Park Rug and Roesel-Heck assert that the facts in the two sets of actions are unrelated, save for the common element of the Herson's showroom. In addition, Roesel-Heck states that discovery was scheduled to be completed by September 15, 1986, and that this did not give the third-party defendants ample time, since they were not served until July, 1986. Roesel-Heck contends that if Herson's cross-claim against it is not stricken, Roesel-Heck will implead still another party, AMITCO, which Roesel-Heck contends is the manufacturer of the allegedly defective tile. This would further complicate the case. Accordingly, Park Rug and Roesel-Heck urge the court to exercise its discretion either to strike the Park Rug claim against Roesel-Heck, or to sever the Park Rug/Roesel-Heck actions to be tried separately, after completion of the DBI/Herson's action.

In response, Herson's argues that the facts are sufficiently related to make it judicially economical for the court to hear all the cross-claims together with the original contract action. However, Herson's arguments are not sufficient to outweigh the fact that the floor tile action is wholly unrelated to that between DBI and Herson's. Herson's action against Park Rug, and Park Rug's action against Roesel-Heck, while originally proper cross-claims stemming from Pinchuck's impleading of Park Rug for her liability to Herson's, are now not properly before the court and should be stricken. Neither Park Rug nor Roesel-Heck "is or may be liable" to Herson's for any part of plaintiff DBI's claim against Herson's, and thus defendant Herson's could not have brought them in under

Fed.R.Civ.P. 14. Similarly, Herson's claim is not "against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim thereto" under Fed.R. Civ.P. 13(g). *See American National Bank and Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 581 (7th Cir.1984) (Rule 13(g) cross-claim must either arise out of the same transaction or occurrence as the main action, or be related to the property that was the subject of the main action). Indeed, Park Rug is not even a co-party of Herson's now that Pinchuck's action against it has been dismissed.

Further, severing the floor tile actions would necessarily result in a dismissal, since Herson's, Park Rug, and Roesel-Heck are all Maryland residents. The court would lack subject matter jurisdiction over these nondiverse actions if they were severed from the DBI/Herson's claims. It is only as ancillary claims that they are in federal court. As the Court of Appeals for the District of Columbia Circuit has noted:

> The rationale which allows federal courts to exercise jurisdiction over such state-law claims is that a sufficiently close nexus exists between those claims and the federal claim properly before the court that effective vindication of the latter requires allowing a party to bring the state and federal claims in one suit.

*U.S. through the Small Business Administration v. Pena*, 731 F.2d 8, 11 (1984). It appears clear that these actions, unrelated to the contract claims between DBI and Herson's, do not meet this test, will only needlessly complicate what should be a two-party case, and are therefore stricken.

The only party that would benefit from the court's continued jurisdiction over the Park Rug and Roesel-Heck actions is Herson's, which would no doubt find it convenient to litigate all its troubles in a single case. However, ancillary jurisdiction, like the closely-related doctrine of pendent jurisdiction, "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218. An action is ancillary if it and the federal claim "derive from a common nucleus of operative facts." *United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. Here, that commonality is lacking. There are no compelling reasons for this court to retain jurisdiction. *See, e.g., Coleman v. Casey County Board of Education*, 686 F.2d 428 (upholding district court's dismissal of defendant's ancillary cross-claim arising out of the same transaction or occurrence); 3 J. Moore, *Moore's Federal Practice* ¶ 13.36 at 13–223 (2d ed. 1985) ("The question should be considered one of discretionary pendent jurisdiction."). The parties are free to pursue these matters in Maryland state court, utilizing whatever discovery was obtained in this action. *See, e.g., Waste Systems, Inc. v. Clean Land Air Water Corp.*, 683 F.2d 927, 931 (5th Cir.1982). The actions involving Park Rug and Roesel-Heck are therefore stricken without prejudice.

As the Seventh Circuit noted, in evaluating the propriety of federal jurisdiction over a nondiverse cross-claim that was "too remote" from the original suit, courts "should be cautious about using elastic and ill-defined notions of ancillary jurisdiction—a concept not mentioned in Article III—to expand [federal] jurisdiction." *American National Bank and Trust Co. of Chicago v. Bailey*, 750 F.2d at 581. Where, as here, the ancillary matters are no longer 'connected' to the original action, the exercise of federal jurisdiction would be not only inefficient but also improper.

### III. The Motions for Summary Judgment

DBI's action is based on nine contracts with Herson's; each contract is the basis of one count of the Amended Complaint. Below is a summary of Counts I–IX:

| Count | Date of Contract | Purchase Price |
| --- | --- | --- |
| I | 12/19/84 | $ 814.00 |
| II | 11/29/84 | $ 4,109.22 |
| III | 11/19/84 | $ 9,833.84 |
| IV | 11/1/84 | $12,730.07 |
| V | 10/29/84 | $ 1,073.10 |
| VI | 9/14/84 | $ 4,796.33 |
| VII | 8/31/84 | $ 5,223.52 |
| VIII | 8/16/84 | $80,142.79 |
| IX | 8/16/84 | $17,374.11 |

DBI and Herson's completed discovery on September 15, 1986, and then filed the cross-motions for summary judgment that are now before the court.

## A. *Herson's Motion: Counts V–IX*

Herson's seeks summary judgment on Counts V–IX of plaintiff's Amended Complaint on the grounds that the bases of Counts V–IX are contracts assigned in violation of the common law prohibition of champerty. Plaintiff DBI was formerly an unincorporated division of Commercial Office Environments, Inc. ("COE"), but became a separate entity under a sales agreement of January 23, 1985. Pursuant to the agreement, DBI contracts were allocated between COE and DBI based on the date when an order was placed with a manufacturer: if placed before December 1, 1985, COE retained ownership; if placed after December 1, 1985, ownership was transferred to DBI under the sales agreement. *See* Agreement of Sale, Exhibit "B" to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition"). Thus the contracts that are the basis of Counts I–IV were DBI's under the agreement, and those that are the basis of Counts V–IX were COE's. DBI agreed to make "reasonable efforts" to collect payments due under the COE contracts in exchange for a 2% commission on payments collected. *Id.*

However, on November 25, 1985, long after Herson's had stopped making payments under its contracts, DBI and COE entered into a second agreement, wherein COE assigned to DBI its five contracts with Herson's. DBI agreed to pay any monies received under these five contracts to COE, and the two parties agreed to divide the costs of the litigation equally, including attorneys' fees.

It is this second agreement which Herson's claims is champertous and therefore void as a matter of law. In support of this claim, Herson's focuses on the following language in the November 25, 1986 agreement:

... COE and DBI have agreed that DBI should institute ... legal proceedings

against Herson for the benefit of itself and COE. Accordingly, in order to permit DBI to institute and maintain such legal proceedings in its own name, COE has and shall deliver to DBI certain assignments ... of the COE–Herson contracts to DBI *for the sole purpose of permitting DBI to institute such legal proceedings* on behalf of itself and COE.

Exhibit "C" to Plaintiff's Opposition (emphasis added). Herson's argues that the exclusivity of purpose underlying the transfer of the COE contracts makes them subject to the common law ban on champertous assignments. In addition, Herson's contends that the contract was made for the purpose of creating federal diversity jurisdiction over the COE contracts, since COE and Herson's are both Maryland citizens, although DBI is a District of Columbia citizen.

The District of Columbia does not have a statute prohibiting champerty, but instead looks to the common law for its definition of this conduct. Under the common law, champerty is defined as "a bargain to divide the proceeds of a litigation between the owner of the litigated claim and the party supporting or enforcing the litigation." 14 W. Jaeger, *Williston on Contracts* § 1711 at 857 (3d ed. 1972) [hereinafter "Williston"]. *See also Restatement of Contracts* § 540. Williston notes that "[p]ublic policy opposes trafficking in lawsuits," § 1715 at 857, and that "the transfer of a claim in litigation or for the collection of which litigation is necessary, in consideration of a promised share of the proceeds of the litigation, is generally held invalid." *Id.* at 873.

Cases in the District of Columbia have focused on champertous agreements between attorneys and clients and are, accordingly, not very helpful in analyzing this case. *See, e.g., Marshall v. Bickel,* 445 A.2d 606 (D.C.1982); *Golden Commisary Corp. v. Shipley,* 157 A.2d 810 (D.C.1960); *Peck v. Heurich,* 167 U.S. 624, 17 S.Ct. 927, 42 L.Ed. 302 (1897). Thus, plaintiff's reliance on these cases of attorney improprieties is misplaced. However, in a recent case before Judge Richey of the U.S. Dis-

trict Court for the District of Columbia, it was noted that "[c]hamperty is prohibited by the District of Columbia." *Koro, Inc. v. Bristol-Myers, Co.,* 568 F.Supp. 280, 285 (D.D.C.1983). In *Koro,* the court applied a New York State statute prohibiting champerty to an assignment of an antitrust claim, finding that the plaintiff could not recover on the claim since the assignment had been made "for the *exclusive purpose* of bringing an action on the claim." *Id.* at 288 (emphasis in original).

While the *Koro* case is not controlling in that it was based upon a New York statute and not the common law or District of Columbia definition of champerty, neither is it entirely irrelevant, as plaintiff contends. The court in *Koro* emphasized that the public policy against "trafficking and speculation in lawsuits," *id.,* applied in the District of Columbia as well as in New York. *Id.* at 287. And the facts of the *Koro* case closely parallel those before this court: there the plaintiff was assigned the right to bring an antitrust action against defendant as part of a stock purchase agreement, and the resulting antitrust action was dismissed. Here, DBI is asserting COE's rights under a COE–Herson's contract pursuant to an assignment whereby COE retains the right to the monies obtained from this lawsuit. The *Koro* court's analysis is therefore helpful and persuasive.

■ Indeed, the facts of this case compel a finding of champerty even more than those in *Koro.* The assignment to DBI of the five COE–Herson's contracts was *not* part of the January, 1985 Agreement of Sale of the DBI division of COE. These five contracts were retained by COE, while four others were sold to DBI. The assignment came some ten months later, under a separate agreement which expressly recited that it was entered into "for the sole purpose of permitting DBI to institute … legal proceedings on behalf of itself and COE." Appendix "C" to Plaintiff's Opposition. This exclusivity of purpose was held to be the "critical factor" in the *Koro* court's finding of champetry. 568 F.Supp. at 288.

It cannot truthfully be argued that DBI acquired the five COE contracts for legitimate business reasons, or as part of the January, 1985, sale. *See* Affidavit of Henry A. Niven, Exhibit "E" to Plaintiff's Opposition, ¶ 3 (stating that the assignment of COE's five contracts with Herson's "was a natural outgrowth of the sale of the business to DBI, Inc. and that company's agreement to make collection efforts on [COE's] behalf."). COE did not sell DBI its five contracts with Herson's as receivables, as it had done with the other four that were transferred to DBI under the Agreement of Sale in January, 1985. Instead, COE assigned the contracts to DBI with the understanding that DBI would give COE the proceeds obtained as a result of this suit. Such an arrangement is precisely what the common law ban on champerty is designed to eliminate: "schemes to promote litigation for the benefit of the promoter rather than for the benefit of the litigant are regarded as contrary to public policy, and will not be enforced." 14 Williston § 1714 at 869. In exchange, DBI is receiving a 50% subsidy of the legal fees it incurs in asserting its own rights under the four contracts it acquired from COE. Such an arrangement falls within the ambit of the common law ban on champerty as enforced in the District of Columbia.

In the recent case of *Marshall v. Bickel,* 445 A.2d 606, 609 (D.C.1982), the court noted that "[i]f a contract is determined to be champertous District of Columbia courts will not enforce it." Accordingly, Counts V through IX of plaintiff's Amended Complaint should be dismissed without prejudice. COE is free to litigate its contract claims against Herson's in another court of competent jurisdiction.

Even if Counts V through IX were not champertous, as this court finds they are, the assignment from COE to DBI raises still another reason why plaintiff's action must be dismissed. If COE and DBI had joined together to sue Herson's, they could not have maintained an action in federal court. There would not have been complete diversity, since COE and Herson's are both citizens of Maryland. Thus, a second

result of the assignment to DBI of COE's claims is that five contract disputes are being adjudicated in the federal court instead of in the courts of the State of Maryland. Section 1359 of 28 U.S.C. precludes this court from taking jurisdiction of "a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." Thus if the assignment from COE to DBI is found to have been "improper," the court must dismiss this action under 28 U.S.C. § 1359.

▮ In considering the propriety of COE's assignment to DBI, several factors are relevant. First, there is a presumption against diversity jurisdiction: the burden is on the party seeking to invoke jurisdiction to show that it is not improper. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1939). Thus, it is DBI which must show that jurisdiction is proper here. Second, the substance of the transaction by which plaintiff purportedly is the proper party must be closely scrutinized. Here, although COE nominally transferred title to these contracts, it retained substantial, if not complete, control over them. Under the agreement with DBI, COE is to get the full amount of recovery under the contracts, is empowered to make litigation and settlement decisions, and most importantly reserves the right to cancel the agreement and take back the contracts if COE "determines that its best interests are not being served by DBI." Exhibit "C" to Plaintiff's Opposition. These terms compel a conclusion that the assignment lacked substance. It was entered into solely to permit DBI to sue on all nine contracts, while not divesting COE of its interest in them.

The third factor, which plaintiff insists is the critical one, is subjective intent. Plaintiff contends that where no intent to create federal jurisdiction is shown, § 1359 is not implicated. The court disagrees. Where, as here the assignment is merely colorable, with no substance underlying it, and results in diversity jurisdiction, § 1359 applies and bars this court from hearing plaintiff's case. The court should not, sole-ly on the strength of plaintiff's denial of improper intent, take jurisdiction of a case which but for a sham assignment would be in the state court system. As the Supreme Court noted in *Kramer v. Caribbean Mills, Inc.:*

> If federal court jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages to the assignor, then a vast amount of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties. Such "manufacture of Federal jurisdiction" was the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors.

394 U.S. 823, 828–9, 89 S.Ct. 1487, 1490, 23 L.Ed.2d 9 (1969). Accordingly, under 28 U.S.C. § 1359, plaintiff's action must be dismissed.

### B. *Herson's Motion: Counts I–IV and X*

As to Counts I–IV, Herson's moves for summary judgment on a different theory. Herson's contends that its contracts with DBI provided that DBI send Herson's an invoice for goods *after* delivery, at which time Herson's then had 10 days to make full payment on that invoice. *See* Exhibits 1–9 to Plaintiff's Amended Complaint. Plaintiff does not challenge this reading of the contract. Herson's further contends that, as to the contracts providing the basis for Counts I–IV, it did not receive delivery of the goods ordered, and had therefore not yet been invoiced for those goods, as of February 6, 1985. Nonetheless, Herson's agent, Phyllis Pinchuck, received a letter from JoAnn Conner, Vice President of DBI, on February 6, 1985, stating that there was an overdue balance on Herson's account of $23,153.69, and that all future deliveries would "be held in the warehouse until the account is brought current." Exhibit "D" to Defendant's Motion for Summary Judgment.

Herson's argues that DBI's letter demanding payment, and stating that future performance would be on a "pro forma" basis (with payment to proceed delivery, rather than to follow it), *see* Exhibit "D" to Defendant's Motion, constituted an antici-

patory repudiation of the contracts underlying Counts I–IV. Herson's relies on the deposition testimony of two DBI employees, JoAnn Conner and Norma Thatcher, who testified that the overdue balance stated in the February 6, 1985 letter was erroneous, and that Herson's account was not delinquent. Defendant's Motion at 4–5. In addition, Herson's relies on the DBI Customer Account Statement dated January 31, 1985, attached to its Motion as Exhibit "C". That statement indicates a "TOTAL DUE" amount of $9,975.01, of which $66.35 was over 90 days due, $2,021.72 was over 60 days due, and $7,886.94 was over 30 days due. It also indicates that DBI received payment from Herson's on January 16, 1986, in the amount of $40,196.41. *Id.* This is hardly consistent with DBI's assertions of delinquency on the part of Herson's.

Further, a close reading of the January 31, 1985 Statement reveals that none of the amounts was invoiced under the contracts which form the basis of Counts I–IV of the Amended Complaint. Instead, the outstanding amounts were invoiced under contracts referred to in this action as VI, VII, VIII, and IX, all of which were owned by COE, not DBI. *See* Exhibit "C" to Defendant's Motion. Thus, it is clear from DBI's own records that its demand letter of February 6, 1985, one week after the January 31, 1985 Statement discussed above, was based on information erroneously generated by plaintiff. Herson's did not owe $23,153.69. *See* Exhibit "D" to Defendant's Motion. There was no recorded invoice for this amount in the January 31, 1985 Statement. In addition, there were no recorded invoices whatsoever for amounts owed under contracts I–IV, the only ones under which DBI concededly had any rights as of February 6, 1985.

Plaintiff does not deny that "[a]s of February 6, 1985, DBI had not delivered any goods to Herson's under its contracts with Herson's." Defendant's Statement of Material Facts as to Which There is No Genuine Dispute, ¶ 15 ("Defendant's Statement"). Instead, plaintiff asserts, bafflingly, that this "is a conclusion of law and not a statement of fact." Plaintiff's State-

ment, ¶ 4. Similarly, plaintiff does not deny that "[a]s of February 6, 1985, DBI, Inc. had not invoiced Herson's for any goods which it was required to deliver to Herson's." Defendant's Statement, ¶ 16. Indeed, plaintiff admits in its Opposition that "a mistake occurred and an incorrect amount was requested." Plaintiff's Opposition at 26–27. Accordingly, this court has little choice but to find, based on unchallenged evidence from plaintiff's own records, that there is "no genuine issue as to any material fact" within the meaning of Rule 56 of the Federal Rules of Civil Procedure as to the status of the Herson's account on February 6, 1985.

The consequences of this finding are severe for plaintiff DBI, for not only did DBI misstate the amount owing but it informed Herson's that based on this supposed delinquency, future performance on the DBI–Herson's contract (as well as on COE–Herson's contracts that DBI did not own) would be on very different terms from those agreed upon by the parties. This was not a mere "innocent mistake," as plaintiff would characterize it. *See* Plaintiff's Opposition at 27. Nor was it a "demand for adequate assurance of performance" under the Uniform Commercial Code ("UCC") as enacted in the District of Columbia at D.C.Code § 28:2–609 (1981). Plaintiff's Opposition at 29. Article 2, § 609 of the UCC provides that:

> When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

D.C.Code § 28:2–609 (1981). The issue of whether grounds for insecurity are "reasonable" is clearly an issue of fact which

would ordinarily preclude summary judgment. Similarly, the issue of whether suspension of performance is "commercially reasonable" is also a question of fact. However, the facts of this case make it possible to determine as a matter of law that DBI's letter of February 6, 1985 to Herson's agent, Phyllis Pinchuck, was not, as it contends, a demand for adequate assurance of performance, but was instead an anticipatory repudiation.

This is so even if all factual inferences are drawn in the light most favorable to DBI, the non-moving party, as this court must do on a motion for summary judgment. *Matsushita Electric Industrial Co., Ltd. v. Zenith,* 475 U.S. 574, 106 S.Ct. 1348, 1456, 89 L.Ed.2d 538 (1986). The relevant portion of the February 6, 1985 letter reads:

> This account has an overdue balance of $23,153.69. As you are aware, our terms are payment within (10) days from the date of invoice.
>
> All future deliveries on the Herson's account will be held in the warehouse until the account is brought current. Once the account is brought to a current status, *all deliveries for Herson Honda will now be performed on a proforma* [sic] *basis.*

Exhibit "D" to Defendant's Motion (emphasis added). This is not a request for assurance, but is instead a unilateral alteration of the contract's terms, as well as an express refusal to render performance due under the terms of the original agreement—that invoices and payment were to follow, not precede, delivery. *See* Exhibits 1–9 to Plaintiff's Amended Complaint.

■ DBI's letter of February 6, 1985, clearly impaired the value of the contract to Herson's within the meaning of D.C. Code § 28:2–610's definition of anticipatory repudiation. A buyer who has contracted for the right to receive and inspect goods at his premises before making payment, and who is then told that he must pay in advance of delivery as to all performances still owed by the seller, has suffered substantial impairment of the contract. *See, e.g., National Farmers' Orga-*

*nization v. Bartlett & Co.,* 560 F.2d 1350, 1355–6 (8th Cir.1977) (seller's demand for payment on a separate contract prior to delivery on a different contract constituted anticipatory repudiation).

Moreover, it is clear from the language emphasized above that even had Herson's paid the amount which DBI erroneously believed was due, bringing the account "current", as the DBI letter puts it, DBI would still have continued to refuse performance except on "pro forma" terms. This is precisely the situation described in the Restatement, Second, of Contracts as an anticipatory repudiation:

> ... where a party states that he will not perform at all unless the other party consents to a modification of his contract rights, the statement is a repudiation even though the concession that he seeks is a minor one, because the breach that he threatens in order to exact it is a complete refusal of performance.

*Id.,* § 250, comment d, at 275 (1981). *See also* UCC § 2–610, Comment 2 (language that "amounts to a statement of intention not to perform except on conditions which go beyond the contract" constitutes a repudiation); *National Farmers' Organization, supra,* 560 F.2d 1350.

DBI erroneously stated the amount owing, demanded immediate payment of that amount (although it was owing not on its own contracts but on those retained by COE), and then took the opportunity of Herson's supposed "delinquency" to refuse to perform except on terms that altered the contract significantly. This is precisely the type of conduct which UCC § 2–609 seeks to avoid: rather than having a party guess or suppose that the other party is in breach, as DBI did here, the UCC provides that the doubting party ask for and receive "assurance of performance" prior to acting in a way that would constitute anticipatory repudiation. *See* Restatement, Second, of Contracts § 251, comment a at 278 (1981) ("This section of the UCC affords [a party to a contract] an opportunity, in appropriate cases, to demand assurance of due performance and thereby avoid the uncertainties that would otherwise inhere in acting

on his belief."). DBI did not avail itself of D.C.Code § 28:2–609 (1981). There is no genuine issue of material fact as to this.

In addition, it is worth noting that while the reasonableness of DBI's belief that Herson's performance was in doubt is ordinarily a question of fact, the facts of this case are such that no reasonable jury could find that DBI's conduct was reasonable. There is no indication in the record that Herson's ability to perform by paying was in doubt. In fact, DBI had received a payment of $40,196.41 as recently as three weeks before the February 6 letter, and had only credited it to Herson's account one week before that letter was sent. *See* Exhibit "C" to Defendant's Motion. In addition, DBI's doubt as to Herson's ability to perform its part of the bargain is belied by Herson's payment of a 50% deposit on each of the nine contracts at issue in the case. Upon that payment, performance was due not from Herson's but from DBI.

DBI cannot, as a matter of law, assert Herson's nonpayment of monies owed on one contract as an excuse for DBI's nonperformance of a separate contract. *See* 3A A. Corbin on *Contracts* § 696 (1960) ("It is well established that the breach of one contract does not justifiy the aggrieved party in refusing to perform another separate and distinct contract."); *National Farmers' Organization v. Bartlett & Co.,* 560 F.2d 1350 (8th Cir.1977) (failure of buyer to pay on one contract did not justify seller's refusal to perform in the future on other contracts; seller held in breach). This is especially so when the contracts under which Herson's is alleged not to have performed were not owned by DBI but by another entity, COE.

DBI's position is completely untenable, stemming as it does from its own bookkeeping errors, and its decision to ignore the provision of D.C.Code § 28:2–609, instead refusing to perform by refusing to deliver those goods for which it had timely received a deposit from Herson's.

Where a party anticipatorily repudiates a contract, as DBI did here, the other party may:

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach ...; and

(c) in either case suspend his own performance ...

D.C.Code § 28:2–610 (1981) ("Anticipatory Repudiation"). Thus, under the D.C.Code, Herson's conduct upon receipt of the February 6, 1985 letter was perfectly justified. Accordingly, Herson's Motion for Summary Judgment as to Counts I–IV is granted.

Count X of the plaintiff's Amended Complaint seeks recovery for receiving, handling, freight, and installation of goods identified to contracts I–V. As of the date of the invoice, February 26, 1985, none of these goods had been delivered to Herson's or installed. Because, as discussed above, DBI anticipatorily repudiated contracts I–IV, and because DBI's action under contract V is champertous, summary judgment is entered in favor of Herson's as to Count X as well.

### C. *DBI's Motion*

DBI seeks partial summary judgment that defendant Herson's "is liable for any amounts due plaintiff in connection with the nine contracts which are the subject of this action." Plaintiff's Motion at 1. DBI also seeks partial summary judgment on Herson's counterclaims.

For the reasons discussed above in connection with Herson's Motion for Partial Summary Judgment, DBI's motion is denied as to Counts I–X of its Amended Complaint. DBI has not shown that it is entitled to judgment as a matter of law. On the contrary, DBI has failed to refute Herson's showing that DBI anticipatorily repudiated contracts I–IV and champertously brought this action as to Counts V–IX. Once DBI had repudiated its contracts, Herson's was not obliged to follow the contracts' provisions as to cancellation, and was certainly not obliged to seek DBI's permission to cancel.

As to Herson's counterclaims, DBI offers no support for its one sentence argument that "defendant's counterclaims are

without merit and should be dismissed," Plaintiff's Motion at 1, or its assertion in a footnote that "[a]llowing Herson's counterclaims to remain would be inconsistent with a finding that the contracts were not cancelled and that Herson's is liable on the nine contracts." Plaintiff's Memorandum at 6, n. 5. Plaintiff has made no effort to meet its burden under Fed.R.Civ.P. 56 as to Herson's counterclaims, and, accordingly, plaintiff's Motion for Partial Summary Judgment is denied as to these claims.

An appropriate Order and Judgment accompany this Memorandum.

## ORDER AND JUDGMENT

This matter came before the court on the motions of third party defendants Park Rug Co. and Roesel-Heck Co. to strike or sever, and on the cross motions for summary judgment of plaintiff and defendant. Upon consideration of these motions, the oppositions thereto, oral argument, and the entire record herein, and for the reasons stated in the accompanying Memorandum, it is by the court this 2nd day of December, 1986

ORDERED that the motion of third party defendant Park Rug Co. is granted; and it is further

ORDERED that the motion of third party defendant Roesel-Heck Co. is granted; and it is further

ORDERED that defendant's action against third party defendant Park Rug Co., and the third party complaint of Park Rug Co. be, and hereby are, dismissed; and it is further

ORDERED that plaintiff's Motion for Summary Judgment is denied; and it is further

ORDERED that defendant's Motion for Summary Judgment is granted; and it is further

ORDERED, ADJUDGED, AND DECREED that summary judgment be, and hereby is, entered in favor of defendant Herson's, Inc. as to Counts I–X of Plaintiff's Amended Complaint.

## ON MOTION FOR RECONSIDERATION

This matter comes before the court on plaintiff's Motion for Reconsideration of this court's December 2, 1986 Memorandum, Order and Judgment, and on defendants' Motion to Amend the Judgment. Because the court can find no new issue of fact or law that would alter its prior ruling, and because defendants' motion is uncontested, save by plaintiff's Motion for Reconsideration, for the reasons set forth below, plaintiff's Motion for Reconsideration is denied and defendants' Motion to Amend the Judgment is granted.

### I. *Background*

This case is the result of a contract dispute between plaintiff Design for Business Interiors, Inc. ("DBI"), a vendor of office furniture, and defendant Herson's Honda, Inc. ("Herson's"), an automobile dealership which contracted to purchase furniture from plaintiff for its new showroom in Rockville, Maryland. In a prior ruling, this court found that plaintiff had champertously obtained contract rights from its predecessor-in-interest, Contemporary Office Environments, Inc. ("COE"), and accordingly the court granted summary judgment for defendants as to those counts of the complaint based on the champertous agreement. (See page 1107). Further, the court found that, as a result of an accounting error, plaintiff had demanded payment from defendants before it was due, and in a letter of February 6, 1985, had conditioned its future performance on defendants' payment in advance. The court held that the February 6, 1985, letter, materially altering the terms of the contract, was an anticipatory repudiation of the contract on plaintiff's part, and therefore the court granted summary judgment for defendant as to the remaining counts of plaintiff's complaint.

### II. *Discussion*

Plaintiff now seeks reconsideration of the December 2, 1986, Order, citing deposition testimony which plaintiff argues raises genuine issues of material fact that preclude summary judgment. Specifically, plaintiff relies on testimony of its employee, JoAnn Conner, in which she stated that she had been told by defendant's agent,

Phyllis Pinchuk, that Mr. Herson would not pay DBI any more money as a means of punishing Ms. Pinchuk for what Mr. Herson considered a poor job on the showroom's flooring. Plaintiff contends that this testimony shows defendants' intent not to perform, even before the February 6, 1985, letter, and that the February 6 letter was a commercially reasonable response to defendants' threatened breach.

The court disagrees. The February 6 letter expressly stated that it was based exclusively on a determination that Herson's account was delinquent—a determination which plaintiff has since conceded was erroneous. There is no mention in the letter of the speculative conversations between Ms. Conner and Ms. Pinchuk. Indeed, such conversations, even if the hearsay problems that they present could be resolved, are of little aid to plaintiff, since it is not clear when they took place, and since plaintiff was the party from whom performance was due. Plaintiff received a payment of $40,000.00 from defendants three weeks before the February 6 letter was sent. This payment may have occurred after the conversations between Ms. Conner and Ms. Pinchuk, and would in that event belie plaintiff's assertion that it doubted defendants' performance and was seeking assurance of that performance. The letter was based instead upon plaintiff's own accounting errors and constituted anticipatory repudiation, justifying defendants' subsequent cancellation of the contracts. Summary judgment for defendants was therefore proper.

Herson's need not have alleged actual receipt of or reliance upon the February 6 letter in order to justify its conduct for two reasons. First, Herson's agent, Ms. Pinchuk, received the letter, and since plaintiff seeks to bind defendants by means of Ms. Pinchuk's signature on several of the contracts, it cannot be heard to deny her agency later, when it does not suit plaintiff. Second, this issue is of no importance since Herson's had no duty to perform under the contract's terms until furniture was delivered and invoiced. Although plaintiff attempted to alter those terms and to seek payment before delivery, defendants were nonetheless under no legal duty to pay. Accordingly, summary judgment for defendants was properly granted.

As to defendants' Motion to Amend the Judgment, plaintiff has conceded that if the court denies plaintiff's Motion for Reconsideration, the court should also grant defendants' Motion to Amend. Defendants seek judgment on Count I of their counterclaim, for deposits of $13,743.56 paid to plaintiff for goods never delivered. As plaintiff notes:

... the legal result of the court's finding that plaintiff caused the anticipatory repudiation of the unperformed contracts would necessitate the granting of defendants' request to recover the deposits on the four contracts at issue. Title 28, D.C.Code § 2.711(1) provides that a buyer may recover the price paid to the seller where the seller fails to make delivery or repudiates. Therefore, should the court deny plaintiff's Motion for Reconsideration, defendants are entitled to the relief sought in their subject motion.

Accordingly, summary judgment for defendants on Count I of their counterclaim is granted. In addition, defendants have asked that Count II of the counterclaim be dismissed without prejudice.

Therefore, upon consideration of the motions, the oppositions thereto, and the entire record herein, it is by the court this 30th day of January, 1987

ORDERED that plaintiff's Motion for Reconsideration is denied; and it is further

ORDERED that defendants' Motion to Amend the Judgment is granted; and it is further

ORDERED that Count II of defendants' counterclaim be and hereby is dismissed; and it is further

ORDERED, ADJUDGED, and DECREED that summary judgment be and hereby is entered against plaintiff as to Count I of defendants' counterclaim, in the amount of $13,743.56.