Kevin BARZ, Jay Behn, Dean Bourquin, Steve Diemer (d/b/a Diemer Brothers), Kent Horner, Larry Meyer, Ken Mutschler, Bart Reinke, Lynn Reinke, Shannon Reinke, Don Swieter, Laverne Swieter, and Kenneth D. Weber, Plaintiffs,

v.

GENEVA ELEVATOR CO., an Iowa corporation, and United Suppliers, Inc., an Iowa corporation, Defendants,

and

GENEVA ELEVATOR CO., an Iowa corporation, Counter–Plaintiff,

v.

Kevin BARZ, Jay Behn, Dean Bourquin, Steve Diemer (d/b/a Diemer Brothers), Kent Horner, Larry Meyer, Ken Mutschler, Bart Reinke, Lynn Reinke, Shannon Reinke, Don Swieter, Laverne Swieter, Kenneth D. Weber, Bruce Behn, Don Butson, Steve Hackbarth, Dallas Hofmeister, Dennis Hofmeister, and Jason Reinke, Counter–Defendants.

No. C 96–3141–MWB.

United States District Court,
N.D. Iowa,
Central Division.

July 1, 1998.

Glenn L. Norris of Hawkins & Norris, Des Moines, IA, for Plaintiffs.

Edward M. Mansfield of Belin, Lamson, Zumbach, Flynn, P.C., Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF GENEVA ELEVATOR CO. AND UNITED SUPPLIERS, INC.

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................. 946
   A. Procedural Background ............................................... 946
   B. Factual Background .................................................. 947

II. LEGAL ANALYSIS ......................................................... 951
   A. Standards For Summary Judgment ..................................... 951
   B. The CEA Claim ...................................................... 952
      1. The "Grain Contracts" ........................................... 953
      2. "Type I" backers ................................................ 954
      3. "Type IIA" and "Type IIB" backers ............................... 955
      4. "Type III" backers .............................................. 957
   C. Negligent Misrepresentation ........................................ 957
   D. Breach–Of–Contract Claims .......................................... 959
      1. Repudiation ..................................................... 959
      2. Substantial impairment .......................................... 962
      3. The Producers' damages .......................................... 963

III. CONCLUSION ............................................................ 964

As these "hedge-to-arrive" contract cases march through the state and federal courts, seemingly endless as the rows of corn in Iowa in July, they may appear to a casual glance to be as uniform as kernels of corn. However, like kernels of corn, upon closer inspection, they show tremendous variety, not in size, shape, color, moisture content, etc., of course, but in the language of the contracts and circumstances of the parties. Thus, as each case ripens to the summary judgment stage, each case—and sometimes each contract for each producer—presents the court with a unique set of circumstances and, it seems, a new set of legal questions.

For example, although the court has now considered whether at least five different kinds of "hedge-to-arrive" contracts are illegal off-exchange "futures" contracts under the Commodities Exchange Act (CEA), 7 U.S.C. §§ 1–25, or valid "cash forward" contracts not within the regulatory purview of the CEA, in rulings in *Top of Iowa Cooperative v. Schewe*, 6 F.Supp.2d 843 (N.D.Iowa 1998), and *Oeltjenbrun v. CSA Investors, Inc.*, 3 F.Supp.2d 1024 (N.D.Iowa 1998), this case involves yet more kinds of HTAs, and nineteen different grain producers. Furthermore, this decision is the first in which this court must consider, in the HTA context,

whether summary judgment is appropriate on negligent misrepresentation claims and whether, in unique circumstances, summary judgment is appropriate on breach-of-contract claims.

## I. INTRODUCTION

### A. Procedural Background

As indicated above, this lawsuit is one of a plethora of cases involving so-called "hedge-to-arrive" contracts (HTAs) for the sale and purchase of grain between grain producers and elevators. This lawsuit, which seeks declaratory judgment and other relief, was filed on September 30, 1996, by a group of grain producers (the Producers): Kevin Barz, Jay Behn, Dean Bourquin, Steve Diemer (d/b/a Diemer Brothers), Kent Horner, Larry Meyer, Ken Mutschler, Bart Reinke, Lynn Reinke, Shannon Reinke, Don Swieter, Laverne Swieter, and Kenneth Weber. The defendants in this case are Geneva Elevator Co. and United Suppliers, Inc., which owns and controls Geneva Elevator.

The Producers' complaint originally asserted the following seven claims: Count I sought declaratory judgment of the rights of the parties to the HTAs, a declaration that the HTAs are illegal, void, and unenforceable, because they violate § 4(a) of the CEA, 7 U.S.C. § 6(a), and such other relief as the court deems just and proper; Count II alleged fraud in violation of § 4b of the CEA, 7 U.S.C. § 6b, and sought declaratory judgment and rescission as appropriate relief; Count III alleged fraud in violation of the same provision of the CEA, but sought damages; Count IV alleged a state-law claim for rescission or cancellation of the contracts on the ground of fraudulent misrepresentations; Count V was a state-law claim of fraudulent misrepresentation and sought actual and punitive damages; Count VI alleged a state-law claim of negligent misrepresentation and sought actual and punitive damages; and, finally, Count VII alleged a state-law claim of breach of contract and sought actual and punitive damages.

On December 9, 1996, Geneva Elevator answered only Count I, the declaratory judgment claim, of the claims against it and asserted a counterclaim in several counts. The causes of action asserted in the counterclaim are as follows: Count I of the counterclaim seeks declaratory judgment that the HTAs in question are valid "cash forward" contracts outside the scope of the CEA; Count II of the counterclaim is a state-law claim for breach of contract and seeks damages; Count III of the counterclaim is a state-law claim for specific performance of the HTAs in question; Count IV of the counterclaim is a state-law claim of promissory estoppel seeking enforcement of the HTAs; and Count V of the counterclaim is a state-law claim for unjust enrichment. The counterclaim is also brought against additional Producers Bruce Behn, Don Butson, Steve Hackbarth, Dallas Hofmeister, Dennis Hofmeister, and Jason Reinke.

On March 3, 1997, this court dismissed Count I of the Producers' complaint as to United Suppliers and ordered the Producers to replead their fraud claims and to make such other amendments as they deemed necessary in light of the defendants' motion to dismiss. On March 25, 1997, the Producers filed an amended complaint to replead the fraud claims pursuant to the March 3, 1997, order. The defendants answered the amended complaint on May 5, 1997, and Geneva Elevator reiterated all counts of its counterclaim.

By order dated April 15, 1998, this court granted the defendants' February 11, 1998, motion for judgment on the pleadings and dismissed Counts II through V of the Producers' complaint with prejudice for failure to plead fraud with the particularity required by FED. R. CIV. P. 9(b). Thus, only the Producers' declaratory judgment, negligent misrepresentation, and breach-of-contract claims remain from their original and amended complaints. The defendants moved for partial summary judgment on these claims and on liability as to all but two of the Producers (Jason Reinke and Kenneth Weber) on Geneva Elevators' own breach-of-contract counterclaim in a motion filed April 30, 1998. That motion is now before the court.

The court heard oral arguments on the motion for partial summary judgment on June 18, 1998. The Producers were represented by counsel Glenn L. Norris of Hawkins & Norris in Des Moines, Iowa. Defen-

dants Geneva Elevator and United Suppliers were represented by counsel Edward M. Mansfield of Belin, Lamson, Zumbach, Flynn, P.C., in Des Moines, Iowa.

### B. Factual Background

The court will discuss here only the nucleus of pertinent facts for this litigation. In its legal analysis, the court will address where necessary the Producers' assertions of genuine issues of material fact that may preclude summary judgment in favor of United Suppliers and Geneva Elevator. The nucleus of pertinent facts begins with an examination of the HTAs the Producers entered into with Geneva Elevator.

Each of the HTAs in question consists of two pages: the first page is denominated a "GRAIN CONTRACT" and bears a preprinted number to which the handwritten addition of "FO" has been made; the second page, referred to by the parties as the "backer," is denominated a "GRAIN PRICING PROCEDURE FUTURES ONLY CONTRACT" and states that it is an "Amendment to Contract # _____" or "Addendum to Grain Contract # _____," with the number of the companion "GRAIN CONTRACT" entered in the space provided. The "GRAIN CONTRACT" page of each HTA is a preprinted form in identical, or virtually identical, form with hand-written insertions indicated by underlining, as follows:

_____, 19___

This is to certify that
_____[name of Producer]_____

_____

has this day contracted and sold __[number of bushels]__ of [corn] at [price] per bushel (_____ lbs. per bushel) Grade No. _____ to be delivered into Geneva Elevator Co. ___[delivery date]___ .

If overrun, the balance to be sold on the market the day of delivery. If short, the shortage will be priced out on last load and Seller will be assessed for the difference. If damaged or inferior grain is delivered and accepted on this contract, the market difference at which such grain is selling under the contracted grade day of delivery

shall be deducted from the contract price without notice to Seller.

Any freight increase, prior to delivery, will be deducted from price.

Seller warrants that title to the commodity described herein is free from lien, security interest or encumbrance of any nature and that Seller has good merchantable title thereto and Seller further agrees to reimburse Buyer for all expenses, legal, market or otherwise arising from any action on the title from this date forward.

The market scale of discounts at time of delivery or time of settlement will prevail.

The parties agree that in the event of shortage of [sic] unavailability of transportation, breakdown of elevator facilities, or other conditions beyond the control of the Buyer, then Buyer shall have the right to extend this agreement. Should elevator be full on date Seller wishes to make delivery, Seller agrees to hold grain until elevator has sufficient space to accept delivery.

Seller and Buyer agree that this contract shall be binding upon the heirs, administrators, executors of both parties and that this contract cannot be assigned or modified by either unless specifically agreed to in writing by Buyer and Seller.

See, e.g., Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 28, Contract No. FO–001826 (April 3, 1995, by Kent Horner).

Although the first page of the HTAs is uniform, and the parties have briefed their arguments on the motion for partial summary judgment as though the second page is also uniform, the "backer" page is in fact in *four* different versions in the HTAs of the various Producers. The court will identify these versions, in what appears to be chronological order, as Type I, Type IIA, Type IIB, and Type III.[1] Type I, Type IIA, and Type IIB versions are typewritten, as opposed to pre-printed, or are copies of a typewritten

---

1. The most complete set of contracts is attached to Defendant Geneva Elevator Co.'s Answer and Counterclaim—And Defendant United Suppliers,

Inc.'s Answer To Counts II–VII Of The Complaint. Therefore, the court will refer to these exhibits in the present statement of facts.

original. Type III backers appear to be pre-printed.

Type I backers are in the following form:

The price shall be established from a price of _____ for the futures month and year of _____. The basis shall be the buyers [sic] posted basis from the above futures month, for delivery during the specified time period. A basis must be established no later than the day of delivery. The buyer reserves the right to assign buyers [sic] posted basis on the day of delivery if no basis has been previously established.

Basis must be established during the regular trading hours of the Chicago Board of Trade when the board is open and trading freely.

*See, e.g,* Answer and Counterclaim, Exhibit E, Contract No. FO–001389 (July 6, 1993, by Diemer Bros.).

Type IIA backers are in fact very rare among the HTAs in question here, but appear to be what the parties have treated as the archetype in the present litigation. They provide as follows:

The price shall be established from a price of _____ for the futures month and year of _____. The basis shall be the buyers [sic] posted basis from the above futures month, for delivery during the specified time period. A basis must be established no later than the day of delivery. The buyer reserves the right to assign buyers [sic] posted basis on the day of delivery if no basis has been previously established. There will be a service charge of _____ per bushel to be paid at the time the contract is established. If a basis is not established prior to *the day before first notice day, the contract will be rolled to* the next deferred futures month using the spread in effect at the close of business on that day. A service charge of _____ per bushel will be assessed each time the contract is rolled forward, plus the spread trading at that time. The spread service charge is to be paid at the time the spread is initiated. In the event of a multi-year contract the seller shall have the option of delivering equal bushels at the current cash bid and rolling the contract, or delivery, using the average of the Futures Only contracts outstanding.

Basis must be established during the regular trading hours of the Chicago Board of Trade when the board is open and trading freely.

*See, e.g.,* Answer and Counterclaim, Exhibit E, Contract No. FO–001549 (January 17, 1994, by Diemer Bros.) (emphasis added). Type IIB backers, far and away the most prevalent of the HTAs at issue here, are identical to Type IIA backers, with the exception that the language italicized above has been omitted, apparently through typographical error. Thus, the sixth sentence of Type IIB backers, incomplete as a consequence of the omission, reads, "If a basis is not established prior to the next deferred futures month using the spread in effect at the close of business on that day." *See, e.g.,* Answer and Counterclaim, Exhibit A, Contract No. FO–001878 (May 17, 1995, by Kevin Barz); *see also.* Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 28, Contract No. FO–001826 (April 3, 1995, by Kent Horner). No party has noted the difference between Type IIA and Type IIB backers, or indeed any difference among the four versions of the HTAs, let alone asserted that the disposition of the present motion for partial summary judgment as to any particular Producer or contract turns upon which version of the backer is at issue. Rather, in their correspondence with the Elevator, the Producers asserted that each of the HTAs they had signed included the language in a Type IIA backer. *See* Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 30, ¶ 2. At oral arguments, counsel for the Producers acknowledged that a line of text had been left out of several of the HTAs, but that the Producers and the Elevator understood the language of the contract to include the missing line.

Even so, there is also a fourth version of the backer of the HTAs at issue here. Type III backers appear to be pre-printed rather than typewritten, and all were entered into in very late September or October of 1995. Each begins by leaving blanks to fill in the "CBOT futures month/year," "Futures price," "Delivery period," "Basis level," "Delivery period," "Basis level," "Delivery basis

point," and "Pricing deadline." The body of these backers is in the following terms:

The final cash price shall be the CBOT futures price listed above adjusted by the Buyer's basis level less any service charges described herein. Basis must be established during the regular trading hours of the Chicago Board of Trade when the board is open and trading freely.

The basis level will be the Buyer's cash bid for the delivery period and destination shown on the contract, less the current trading futures price of the CBOT contract shown above at the time the Seller elects to fix the basis. The final cash price must be established no later than the day of delivery. The Buyer reserves the right to assign Buyer's posted basis on the day of delivery if no basis has been previously established. There will be a service charge of ____ (corn) or ____ (beans) per bushel to be paid at the time the contract is established.

If the final cash price has not been established by the Seller prior to the day before first notice day of the designated futures month shown on this Addendum, Buyer will change the contract CBOT futures month to the next deferred futures month. The CBOT futures price as shown on this Addendum shall be adjusted by the differential between the two futures month[s] at the time of the "rollover". An additional service charge of ____ (corn) or ____ (beans) cents per bushel will be assessed by the Buyer each time the contract futures month is rolled forward. Delivery of the designated physical commodity is required under this contract.

*See, e.g.,* Answer and Counterclaim, Exhibit A, Contract No. FO–002390 (October 16, 1995, by Kevin Barz).

Each of the Producers had a number of HTAs with Geneva Elevator, which are listed in tabular form in Exhibit 1 to the Producers' Appendix in support of their Resistance to Summary Judgment. Each of the contracts was "rolled" at least once; most were rolled two or three times until the Summer of 1996. Each of the Producers had either a written "Flex Hedge Program" or an agreed, but unwritten plan, for delivery of grain pursuant to their HTAs over several crop years. *See, e.g.,* Appendix to Geneva Elevator Co. and

United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 27. Before entering into these HTAs, fifteen of the Producers obtained advice from a paid advisor, Dennis Hofmeister. The Producers contend that they also relied upon statements made by representatives of Geneva Elevator. In aggregate, each Producer's HTAs involve more grain than that Producer ordinarily grows in a single crop year. Thirteen of the Producers delivered grain on at least some of these HTAs.

During 1996, there was an unprecedented rise in corn prices, prompting many farmers to sell corn on the cash market and to roll their HTAs. On March 29, 1996, the Elevator sent each of the Producers a letter concerning his HTAs, which stated the following:

Dear Customer:

During the summer of 1995, you committed to several hedge-to-arrive contracts with Geneva Elevator. Most of these contracts have futures pricing currently against the May '96 or July '96 futures. A portion of these contracts will need to be rolled to December '96 and beyond futures contracts.

With the tight corn carry out, as projected in the 3/29/96 USDA reports on Grain Stocks and Planting Intentions, the volatility of the old against new crop corn futures will be difficult to predict. In light of this, there appears to be a heightened degree of risk to remaining in old crop futures against new crop delivery.

If you have a hedge-to-arrive contract and the forward delivery portion of this contract is priced currently against the May 1996 futures, the market discount to roll this contract to December, 1996, futures would be 87 cents a bushel today. To achieve a final cash price, the futures price would be lowered additionally by the elevator basis. From this date forward, the new crop futures price may lose or gain against old crop futures prices.

Attached is a listing of your open hedge-to-arrive contracts. Please contact the elevator and advise us how you will handle the rolling or pricing of these contracts.

Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary

Judgment, Exhibit 29. Again on May 14, 1996, the Elevator sent the Producers another letter:

Dear Customer:

The futures markets in the last two months have been extremely volatile. The volatility has made all of us aware of how strong a demand market we are in and how difficult it is to forecast the direction of the futures market trades.

On March 26, 1996, we sent you a letter discussing the volatility of the futures markets as they relate to hedge-to-arrive contracts. Some of you have priced your hedge-to-arrive contracts and the balances have been rolled to the July 1996 futures or beyond. Enclosed is an article that Farmers Commodities Corporation sent to us on May 9, 1996. The attached article discusses the volatility and risk associated with hedge-to-arrives. Please read this and call us if you have any questions about it.

If you have a hedge-to-arrive contract and the forward delivery portion of this contract is currently priced against the July 1996 futures, contact the elevator and set up an appointment so that we can discuss and work out a plan to handle the disposition of the contract.

*Id.* A third, undated letter from the Elevator to the Producers followed:

Thank you for meeting with us to discuss your Hedge to Arrive Contracts at Geneva Elevator. As we discussed then, the recent run up in grain market prices has resulted in a significant deterioration in the market value of your contracts. The market volatility experienced this past week further highlights the need to formalize a workout strategy for your position.

We would like to meet with you at your earliest convenience to discuss your plan for resolving this situation. We request you both attend this meeting as we expect to negotiate a definitive workout plan with you.

We have set aside June 11, 12, 14, and 17th as meeting dates. Please contact Jim or Pat at the Elevator to reserve a meeting time that will work for you. We can meet with you at the Elevator or your home.

*Id.* Each of these letters was provided to Geneva Elevator by United Suppliers, retyped on Geneva Elevator letterhead, and signed by Jim Gilbertson, the General Manager of Geneva Elevator. The last letter identified the senders as Gilbertson and Jerry Van Oort, the Retail Division Manager of United Suppliers.

On June 18, 1996, Producers Barz, Jay Behn, Bourquin, Butson, Diemer, Hackbarth, Dennis Hofmeister, Horner, Mutschler, Meyer, Lynn Reinke, Shannon Reinke, Donald Swieter, and LaVerne Swieter sent Geneva Elevator the following letter:

Dear Mr. Gilbertson:

After receiving your recent undated letter, I sought legal advice about the "Futures Only" contracts between me and your elevator. My attorney has made the following points:

1. According to the "Grain Pricing Procedure, Futures Only Contract" between buyer (the elevator) and seller (me), I always have the option not to deliver grain pursuant to the contract. Accordingly, I fail to understand what, on my part, there is to work out of [sic].

2. The original contracts clearly states [sic] that "If the basis is not established prior to the day before first notice day, the contract will be rolled to the next deferred futures month using the spread in effect at the close of business on that day." My contracts with you were written pursuant to a multi-year marketing plan, of which you were aware. Accordingly, we both knew then and know now that I did not have the present ability to deliver in this crop year the total amount of grain stated in the contracts. The rolled contracts bear no relationship to any current futures price. It now appears that the elevator intends to attempt to make me responsible for a position in the commodities futures market supposedly held by the elevator.

3. None of the "rolled" HTA contracts contains a price that corresponds to any price at which a commodity traded on the Chicago Board of Trade on the date of the contract. Rather, they bear a price related to the difference in a futures spread and the previous contract price. Thus, the

current HTA's [sic] are an imaginary paper transaction. Nevertheless, the elevator is contending that I am somehow responsible to reimburse the elevator for its current futures trading in its own account. My attorney has advised me that off-board futures activity is illegal under the Commodities Exchange Act, 7 U.S.C. § 1 et seq., which likely makes these agreements illegal. The only basis for roll and spread charges in the contract is to create a futures contract, not a cash forward delivery contract.

If Geneva Elevator Co. claims to hold short positions in July 96 corn or bean futures (or those for any other month), which you claim to be for my benefit, and they have not been canceled out or hedged by the elevator by now, please be on notice that I do not have responsibility for those futures positions and I do not have responsibility for any margins on those positions. You should act accordingly to best mitigate your losses, if any.

Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 30. The Elevator contends that this letter constituted a repudiation of the HTAs by these Producers. Larry Meyer subsequently retracted the letter, but joined the other Producers in this lawsuit and has not delivered grain on his HTAs. Bart Reinke orally stated that he would not deliver more than one year's production pursuant to his HTAs. The Elevator contends that both Meyer and Bart Reinke have also repudiated their HTAs. Other correspondence between the parties prior to the filing of this lawsuit on September 30, 1996, and other factual contentions, will be discussed as they become pertinent to the court's legal analysis.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

■ This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of recent decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp.

1224, 1229–32 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added).[2] Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d

2. Geneva Elevator and United Suppliers have moved for partial summary judgment on the Producers' remaining claims as well as for partial summary judgment on liability, as against all but two of the Producers, on Geneva Elevator's own counterclaim for breach of contract. Thus, both subsections (a) and (b) of Rule 56 are pertinent here.

1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394.

Furthermore, in *Coonley v. Fortis Benefit Ins. Co.*, 956 F.Supp. 841 (N.D.Iowa 1997), *aff'd*, 128 F.3d 675 (8th Cir.1997), this court recognized that primarily legal issues generally, and contract interpretation questions specifically, are issues amenable to summary disposition. *Coonley*, 956 F.Supp. at 844; *accord Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995) (in an ERISA plan interpretation case, the court observed, "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate," citing *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir.1990)); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564–65 (7th Cir.1995) ("Summary judgment is particularly appropriate in cases involving the interpretation of contracts."); *Mumford v. Godfried*, 52 F.3d 756, 759 (8th Cir.1995) ("Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."); *McPeek v. Beatrice Co.*, 936 F.Supp. 618, 626 (N.D.Iowa 1996) (ERISA contract interpretation case before the court on summary judgment which quotes *Murphy*, 61 F.3d at 564–65). Similarly, this court has also concluded that statutory interpretation—particularly interpretation of the effect of a statute where facts are undisputed—is primarily a legal question amenable to summary judgment. *See Prudential Ins. Co. of Am. v. Rand & Reed Powers Partnership*, 972 F.Supp. 1194, 1202–03 (N.D.Iowa 1997), *aff'd*, 141 F.3d 834, (8th Cir. 1998); *accord United States v. Carr*, 66 F.3d 981, 983 (8th Cir.1995) (statutory interpretation is a question of law reviewed *de novo* ); *United States v. Moore*, 38 F.3d 977, 979 (8th Cir.1994) (the task of statutory interpretation "is one best placed in the hands of the trial judge," because it is a question of law); *United States v. Brummels*, 15 F.3d 769, 771 (8th Cir.1994) (explaining that, while findings of fact are reviewed for clear error, "[a]s to application of facts to the legal interpretation of [a statute], the standard of review is *de novo* "). Thus, because some of the issues before the court are essentially legal—contract and statutory interpretation—summary disposition may be particularly appropriate. *See Coonley*, 956 F.Supp. at 845.

With these standards in mind, the court turns to consideration of the defendants' motion for partial summary judgment.

### B. The CEA Claim

First, Geneva Elevator has moved for summary judgment on the Producers' declaratory judgment claim, which seeks a declaration that the HTAs the Producers entered into with Geneva Elevator are illegal off-exchange futures contracts, not valid cash forward contracts under the CEA. Geneva Elevator asserts that, under the standards articulated in this court's ruling in *Oeltjenbrun v. CSA Investors, Inc.*, 3 F.Supp.2d 1024 (N.D.Iowa 1998), and for many of the same reasons, the HTAs here are valid cash forward contracts. The Producers do not dispute the standards articulated in *Oeltjenbrun*, but seek to distinguish that decision. They assert that no party could have had a subjective belief that the Producers intended actual physical delivery of corn, because the HTAs involved more corn than they could produce in a year, and thus involved only "phantom corn." They also argued at oral arguments that it was clear to all parties that the Producers did not have enough grain to deliver on their HTAs in July of 1996, because they had already sold the majority of their corn to the Elevator for cash. They seek to distinguish their HTAs from those Oeltjenbrun had with FCC or Land O' Lakes, because their HTAs specifically permit rolling by the Producer as a matter of right, and furthermore they argue that this ability to make unlimited rolls ne-

gates any real and binding delivery obligation. They also assert that the only inherent value of the HTAs was as a means of speculation and profit, not as a means of exchanging grain between a producer and an elevator.

Because the parties do not dispute the court's statement of the applicable law in *Oeltjenbrun,* the court need not repeat the detailed discussion in that decision of the differences between "futures" contracts and "cash forward" contracts as well as the tests courts use to distinguish between them. *See Oeltjenbrun,* 3 F.Supp.2d at 1033–37,. Instead, the court will pass on here to the question of whether the Producers' HTAs fall into one category or the other. However, it bears repeating that, in determining whether a contract is a futures contract or a cash forward contract, courts have cautioned that " '[s]elf-serving labels that the defendants choose to give their contracts should not deter the conclusion that their contracts, as a matter of law, [are futures contracts subject to the CEA].' " *Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 773 (9th Cir.1995) (quoting *Commodity Futures Trading Commission v. American Metal Exchange Corp.,* 693 F.Supp. 168, 192 (D.N.J.1988), in turn quoting *Commodity Futures Trading Commission v. Morgan, Harris & Scott, Ltd.,* 484 F.Supp. 669, 675 (S.D.N.Y.1979)), *cert. denied sub nom. Schulze v. Commodity Futures Trading Comm'n,* — U.S. ——, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996). As the Ninth Circuit Court of Appeals observed some years ago, in determining whether a contract for sale of a commodity is a futures contract or a cash forward contract, "no bright-line definition or list of characterizing elements is determinative. The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *Commodity Futures Trading Commission v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 581 (9th Cir.1982).

In *Oeltjenbrun,* this court noted that the focus of judicial determinations of whether or not a contract is a valid cash forward contract was whether there was any obligation to make actual physical delivery of the commodity in question. *See Oeltjenbrun,* 3 F.Supp.2d at 1045–46 (citing *Noble Metals*

*Int'l, Inc.,* 67 F.3d at 773; *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir.1993), *cert. denied,* 511 U.S. 1031, 114 S.Ct. 1540, 128 L.Ed.2d 192 (1994); *In re Bybee,* 945 F.2d 309, 313 (9th Cir.1991); and *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578). The court will begin its analysis here by examining the "delivery" obligation under the identical "Grain Contract" part of each HTA, then consider whether any of the versions of the backer page of the HTAs negate that obligation, if it exists, to such an extent as to transform these HTAs into illegal futures contracts.

### 1. The "Grain Contracts"

■ There can be little doubt that the "Grain Contract" portion of these HTAs is a contract for actual physical delivery of corn at a future date. This contract plainly contemplates actual physical delivery of a specified amount of grain to a specified location at a specified price during a specified period of time.. *Noble Metals Int'l, Inc.,* 67 F.3d at 773 (considering contemplation of actual physical delivery of grain as a characteristic of a cash forward contract); *Salomon Forex, Inc.,* 8 F.3d at 971 (same); *In re Bybee,* 945 F.2d at 313 (same); *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (same). It states that each Producer "has this day contracted and sold" a specified number of bushels of corn at a specified price and grade "to be delivered into Geneva Elevator Co." on a specified date. *See, e.g.,* Appendix to Geneva Elevator Co. and United Supplier, Inc.'s Motion For Partial Summary Judgment, Exhibit 28, Contract No. FO–001826 (April 3, 1995, by Kent Horner). Furthermore, the contract specifies terms for shortage, "overrun," damage, and freedom of the grain from encumbrances, as well as other contingencies only relevant to the actual delivery of grain, such as transportation, breakdown of the elevator facilities, or the possibility that the elevator will be full "on date Seller wishes to make delivery." *Id.*

The contract is also between a seller engaged in the business of producing grain and a buyer engaged in the business of buying grain and involves individually negotiated terms of amount, price, and delivery date.

*Salomon Forex, Inc.,* 8 F.3d at 971 ("cash forwards are generally individually negotiated sales of commodities between principals"). Finally, because the contract is between a grain producer and a grain elevator, the contract was entered into between parties able to make and receive physical delivery of the subject goods. *Id.* The grain contract clearly has "inherent value" to each of the parties: to each Producer, because it provides for sale of a substantial share of his annual crop, and to the Elevator, because it provides the source of a supply of grain for the Elevator's business. *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578 (examining the "inherent value" of the contract to the parties).

The court finds that, contrary to the Producers' assertions, there is no genuine issue of material fact that they did not intend delivery pursuant to any of the versions of the HTAs. The Elevators have cited evidence establishing that all of the Producers at least initially intended to deliver grain pursuant to such contracts, Barz Dep. at 92; Behn Dep. at 52; Bourquin Dep. at 23, 38–39; Butson Dep. at 59–60; Diemer Dep. at 49; Hackbarth Dep. at 86; Dallas Hofmeister Dep. at 62; Dennis Hofmeister Dep. at 279–80; Horner Dep. at 83; Meyer Dep. at 47; Mutschler Dep. at 46–47; Bart Reinke Dep. at 66; Jason Reinke Dep. at 42; Lynn Rienke Dep. at 67, 82; Shannon Reinke Dep. at 50; Donald Swieter Dep. at 61; LaVerne Swieter Dep. at 65; and Weber Dep. at 78, and that some of them did indeed deliver grain on similar contracts. Barz Dep. at 44–45; Behn Dep. at 24; Bourquin Dep. at 38; Buston Dep. at 78; Diemer Dep. at 13; Hackbarth Dep. at 21; Dallas Hofmeister Dep. at 59; Horner Dep. at 18; Meyer Dep. at 63; Bart Reinke Dep. at 42; Lynn Reinke Dep. at 82; and Weber Dep. at 15. In their "controversion," the Producers assert that there is a genuine issue of material fact as to whether any of them originally intended to deliver grain in July of 1996. This contention misses the point, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394, because the question is not whether they intended to make delivery at a specific date,

but whether they understood the contracts to require delivery and intended to make delivery pursuant to the contracts, for example, after exercising a right to roll. This intention is established beyond doubt.

Altogether, the "nature" of the contract is an individual transaction for the purchase and sale—and subsequent actual delivery—of grain. Indeed, at oral arguments, counsel for the Producers conceded that the first page of the contracts is a standard cash forward contract. Thus, if the HTAs are illegal futures contracts, not cash forward contracts, it can only be because of the Amendments or Addenda to those contracts.

### 2. *"Type I" backers*

Type I backers on their face change nothing about the delivery obligation under these HTAs. Because there is no express "roll" provision, either permitting, forbidding, or in any way contemplating rolling, these contracts, like the FCC contracts at issue in *Oeltjenbrun,* at best were "administered" in such a fashion that rolling was permitted. The rolling of HTAs with Type I backers is similar to the "bookout" agreements the Ninth Circuit Court of Appeals found the CFTC countenanced in *In re Bybee,* 945 F.2d at 314. Like "bookout" agreements, the agreements to roll HTAs with Type I backers were separate, individually negotiated, new agreements; there was no obligation or arrangement to enter into rolls in the original contracts; the agreements to roll were not provided for by the terms of the contracts as initially entered into; and Geneva Elevator was therefore entitled to demand delivery, although it instead decided to roll the contracts upon the Producers' request, and Producers with such contracts were entitled to make delivery, pursuant to the terms of the original contract. *In re Bybee,* 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions,* 55 Fed. Reg. 39188, 39192 (Sept. 25, 1990), which concluded that, for these reasons, "bookout" agreements did not negate the delivery requirement and did not change cash forward contracts into illegal futures contracts). Furthermore, the obligation to make actual delivery of corn after the rolls remained just

as real and binding as the delivery obligation was in the original contract, because rolling was not a matter of right by the Producer, but a matter of forbearance by the Elevator. Therefore, HTAs with Type I backers are cash forward contracts.

### 3. "Type IIA" and "Type IIB" backers

■ The court will treat these two versions as one, assuming, as have the Producers, that all Type IIA and Type IIB backers, which differ only because of omission of a single line of text from Type IIB backers, probably as the result of a typographical error, are Type IIA. This is appropriate, first, because no party has attempted to generate a genuine issue of material fact nor asserted any difference in legal effect on the basis of any distinction between Type IIA backers and Type IIB backers, and, second, because the court finds that there is no significant legal effect to the difference. Although in their letter of June 18, 1996, the Producers pointed to the language in Type IIA backers as establishing their right to "roll" their HTAs, other language establishing that right is in both versions: "In the event of a multi-year contract the seller shall have the option of delivering equal bushels at the current cash bid and rolling the contract, or delivery, using the average of the Futures Only contracts outstanding." *See, e.g.,* Answer and Counterclaim, Exhibit E, Contract No. FO–001549 (January 17, 1994, by Diemer Bros.).

Type II backers reiterate the Producer's obligation to deliver grain on the HTAs. First, they state that "[a] basis must be established no later than *the day of delivery.*" *Id.* Second, the contracts state that the seller has the option to roll the contract "or delivery" if the Producer chooses to deliver "equal bushels at the current cash bid." *Id.* Thus, the Producer is allowed to substitute *delivery* at one price for *delivery* at the contract price, but must still roll *delivery* at the contract price, adjusted for the opportunity to roll, to a new date.

Although the Producers assert that the opportunity to roll distinguishes their HTAs from those discussed in *Oeltjenbrun,* they ignore the portion of *Oeltjenbrun* in which the court discussed HTAs, the FCS HTAs, that did permit rolling. *See Oeltjenbrun,* 3

F.Supp.2d at 1042–44. In that case, this court wrote the following:

Oeltjenbrun maintains that the "unlimited" rolling specifically permitted under provisions of these contracts, *see, e .g.,* FCS Ex. A at ¶ 4, transform them into illegal futures contracts, because rolling can occur beyond the crop year. Furthermore, he argues that the rolling of these contracts, requires futures transactions without parallel physical transactions of grain, because the elevator must close out its short positions taken to protect itself against non-delivery, and the costs of those futures transactions are passed on to the producer in the repricing of the rolled contract. Thus, he contends that the delivery price does not reflect the value of the grain at delivery, demonstrating the speculative nature of the transactions. Oeltjenbrun contends these facts make the HTA contracts speculative, not merely contracts for actual delivery. Oeltjenbrun suggests that the district court in *In re Grain Land Co-op Cases* failed to recognize the significance of this aspect of HTA contracts. Oeltjenbrun also asserts that unlimited rolling essentially negates any actual delivery requirement of the contracts. The court is unpersuaded by these arguments.

First, in asserting that rolls beyond the crop year are outside the scope of cash forward contracts, Oeltjenbrun relies primarily on the CFTC's May 15, 1996, *Statement of Policy,* which he argues should be accorded great deference as an agency interpretation of the statute charged with its administration. Judge Magnuson dismissed such an argument in *In re Grain Land Co-op Cases,* because "[a]gency statements of guidance are not law," and because of the "reserved terms" in which the policy interpretation was offered. *In re Grain Land Co-op. Cases,* 978 F.Supp. 1267, 1277 (D.Minn.1997). Similarly, this court finds that the CFTC's May 15, 1996, *Statement of Policy* is not the kind of agency interpretation to which any particular deference is due. As this court has observed, the degree of deference to be given an agency's interpretation depends upon what kind of rule or regulation states the interpretation. *See Sicard v. City of*

*Sioux City,* 950 F.Supp. 1420, 1433 (N.D.Iowa 1996); *Raymond S. v. Ramirez,* 918 F.Supp. 1280, 1291–92 (N.D.Iowa 1996). "Interpretive rules" by an agency that interpret statutory language are afforded less deference than other agency pronouncements, because "interpretive rules" have not been subjected to "notice-and-comment," but instead have been " ' "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." ' " *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), in turn quoting the Attorney General's Manual on the Administrative Procedure Act 30 n. 3 (1947)). Such "interpretive rules" do not have the force and effect of law and "are not accorded that weight in adjudicatory process." *Id.* Although the courts may find such interpretations persuasive and treat them as if they were binding, the courts have the discretion to substitute their own judgment on all questions of statutory interpretation. *See Batterton v. Francis,* 432 U.S. 416, 424–25 & n. 9, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). The court has some doubt the *Statement of Policy* even rises to the level of an "interpretive rule," since, as Judge Magnuson observed, it purports to explain only the Division of Economic Analysis's "views on the application of the principles of prudent risk-reduction to the structure of HTA contracts," CFTC's Division of Economic Analysis Issues Statements of Policy and Guidance Relating to "Hedge–to–Arrive" Contracts, No. 3911–96 (May 15, 1996), not a definitive statutory interpretation, and there is no indication that the *Statement of Policy* has been subjected to notice-and-comment procedures. Furthermore, nowhere in the statutory language of the CEA is there a restriction on "any sale of any cash commodity for deferred shipment or delivery," excluded from coverage by the Act, to deferment of delivery within a single crop year. 7 U.S.C. § 1a(11).

Nor does the fact that rolling of these contracts might require other futures transactions without parallel physical transactions somehow transform these contracts for physical delivery of corn into speculative futures transactions. Such companion futures transactions are one step further removed from the "bookout" transactions described by the Ninth Circuit Court of Appeals in *In re Bybee,* because they do not extinguish the delivery obligation *on the HTA contract,* and do not involve the same parties, although, like "bookout" transactions, parallel futures transactions are separate new agreements, there is no obligation or arrangement to enter into such futures transactions in the FCS HTAs, the futures transactions are not provided for by the terms of the FCS HTAs as initially entered into, and the obligation to deliver on the FCS HTAs remains in force, however many parallel futures transactions may be entered into. *Cf. In re Bybee,* 945 F.2d at 314 (citing *Statutory Interpretation Concerning Forward Transactions,* 55 Fed.Reg. 39188, 39192 (Sept. 25, 1990)). Although the rolling feature of these contracts undoubtedly does increase the riskiness of the trade, and does allow the producer to speculate on the delivery price of his grain, the roll feature does not negate the nature of these contracts as contracts for actual physical delivery of grain. *Accord In re Grain Land Coop Cases,* 978 F.Supp. at 1277 ("While the HTAs' rolling feature may have introduced imprudent risk in hindsight, it does not fatally detract from the instruments' principal purpose. As discussed above, the contracts on their face contemplate the cash sale of grain for deferred delivery.").

However, Oeltjenbrun asserts that the "unlimited" rolling permitted under the FCS HTAs does essentially negate any actual delivery requirement of those contracts—that is, it makes the delivery obligation "diffuse" and "indeterminate." This argument, however, disregards the fact that there are indeed limits on rolling in the contracts, because there is a price to be paid for every roll. Not only is there a spread/rolling fee, *see, e.g.,* FCS Ex. A, ¶ 8, but the CBT price, and hence the cash price, changes that occur with every roll will eventually make it

more cost effective to deliver on the contracts than to roll them. The fact that, as unprecedented market conditions developed, Oeltjenbrun undertook far more rolls than could reasonably have been anticipated to take advantage of higher cash prices for grain than he could get on his HTAs does not mean that delivery would *never* occur on these contracts. Nor does the fact that rolling creates disparity between the delivery price and the value of the crop necessarily transform the HTAs into illegal futures contracts. That argument disregards the fact that the rolled price adjusts for the cost of the roll. Consequently, the rolled price may not reflect the value of the grain at delivery, but it does reflect the value of the grain reduced by the cost of rolling to a later delivery date, a benefit the producer has already enjoyed. Therefore, the FCS contracts denominated "HEDGE–TO–ARRIVE" contracts still fit within the cash forward contract exception to the CEA, because they remain contracts for deferred shipment or delivery of actual grain.

*Oeltjenbrun,* 3 F.Supp.2d at 1042–44. Because the court has already addressed similar arguments, the court is unpersuaded by the Producers' assertion that HTAs permitting rolling beyond the current crop year create "phantom grain"; that HTAs permitting unlimited rolling create "imaginary paper transactions"; that their contracts are futures contracts because there is no connection between their contract price and the value of the grain; that their HTAs created undue risk and speculation; or that the CFTC's May 15, 1996, *Statement of Policy* is entitled to any deference. Consequently, the court concludes that HTAs with Type II backers are also valid cash forward contracts.

### 4. "Type III" backers

■ Finally, the court must consider whether "Type III" backers differ in significant respects from either of the versions previously discussed to hold that they are illegal off-exchange futures contracts as a matter of law. The court concludes that they do not. Just as the "rolling" permitted under HTAs with Type II backers does not transform them into futures contracts, the provisions for "rollover" in Type III backers

do not either. Furthermore, Type III backers make it abundantly clear that, despite the "rollover" provision, "[d]elivery of the designated physical commodity is required under this contract." *See, e.g.,* Answer and Counterclaim, Exhibit A, Contract No. FO–002390 (October 16, 1995, by Kevin Barz).

Because none of the versions of the Amendments or Addenda change the nature of these contracts from contracts for actual physical delivery of grain into illegal futures contracts, the court concludes that, as a matter of law, the Elevator is entitled to summary judgment on Count I of the Producers' complaint, which seeks a declaration to the contrary.

### C. Negligent Misrepresentation

■ The Elevator and United Suppliers next seek summary judgment on the Producers' negligent misrepresentation claim on three grounds: there is no genuine issue of material fact that the Elevator was *not* in the business of supplying information; the Producers have suffered no cognizable damages; and there is no genuine issue of material fact that the Producers justifiably relied upon the alleged misrepresentations. The Producers assert that the Elevator supplied information as a part of their overall product, as part of their day-to-day business. They also assert that negligent misrepresentation entitles them to both tort damages, including damages for emotional distress, and contract damages for benefit of the bargain, which they argue are supported by the record. Finally, they assert that they can demonstrate a relationship of trust between the Producers and Elevator employees that induced them justifiably to rely upon representations made to them about HTAs by Elevator employees. In reply, the defendants reaffirm their contentions that the Producers have no cognizable damages and that the Elevator was not in the business of supplying information. They contend further that the testimony of the Producers confirms that any representations made by Elevator employees were only incidental to the HTA grain transactions.

This court discussed a negligent misrepresentation claim at the motion to dismiss stage of the proceedings in another HTA

case, *Brown v. North Central F.S., Inc.*, 173 F.R.D. 658 (N.D.Iowa 1997):

Under Iowa law, in order to sustain a claim of negligent misrepresentation, the defendant must be one who is "in the business of supplying information." *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996). The court, not the jury, decides whether defendants were "in the business of supplying information" as a matter of law, in light of the facts, because the defendants' duty is always a matter for the court to decide. *See, e.g., Fry*, 554 N.W.2d at 265 (in a negligent misrepresentation case, the court wrote, "Whether such a duty exists is always a question of law for the court."); *Greatbatch v. Metropolitan Fed. Bank*, 534 N.W.2d 115, 116 (Iowa Ct.App.1995) (in a negligent misrepresentation case, the court wrote, "Whether a duty exists to impose an obligation on a defendant to conform to a standard of care for the benefit of the plaintiff is an issue of law for courts to resolve"); *Leonard v. State*, 491 N.W.2d 508, 509 (Iowa 1992) (in a case involving the duty of a mental hospital to a person subsequently injured by a patient released from the hospital, the court wrote, "Whether, under a given set of facts, such a duty exists is a question of law."). Although the Iowa Supreme Court has indicated that "professional purveyors" of information, such as accountants, abstractors, or attorneys, whose product is information, often are "in the business of supplying information," *Fry*, 554 N.W.2d at 265, these are not the only categories of persons against whom the claim will lie.

The claim may also be pursued where the defendant provided information as "part of the overall product." *See Greatbatch*, 534 N.W.2d at 118 (distinguishing cases where information is supplied as "part of the overall product," and the defendant was thus "in the business of supplying information," from cases in which the information was merely "incidental to the underlying ... transaction," and the defendant therefore was not subject to a negligent misrepresentation claim). Here, the Elevator and its agents are alleged to have advised the Producers on appropriate means to market their grain to the best advantage, to have assisted in the develop-ment of the Producers' "marketing plans" for their grain, and to have held themselves out as experienced in the use of marketing tools such as HTAs. *See, e.g.,* The Brown Case, Amended And Substituted Complaint, ¶¶ 14–17; The CeBar Farms Case, Amended And Substituted Complaint, ¶¶ 10–13. As alleged, therefore, the information concerning HTAs supplied by the Elevator and its agents was part of, not incidental to, the purchase of grain from the Producers. *Cf. Greatbatch*, 534 N.W.2d at 118.

Furthermore, the transactions in question here were not simply "arm's length" transactions, because the information about HTAs was given to guide grain producers like the plaintiffs in the choice of appropriate marketing methods; *i.e.,* the transaction was more than just a sales negotiation. *See Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller*, 514 N.W.2d 905, 910 (Iowa 1994).

*Brown*, 173 F.R.D. at 672.

The *evidence* in the summary judgment record here does not rise to the level of the *allegations* in the complaint in *Brown*. First, upon review of the record it is apparent that the Elevator's employees were not "professional purveyors" of information like "accountants, abstractors, or attorneys," as the Producers concede. *Id.* Nor does the record support the Producers' contentions that the Elevator's or United Suppliers' employees provided information as part of their overall product. *Id.* At most, the record shows that on some isolated instances some vague information about HTAs was discussed by some Elevator employees with some of the Producers. The "breakfast" meetings at which a representative of the defendants discussed HTAs occurred as much as two years before HTAs at issue here were entered into and any discussion of HTAs at such breakfasts was incidental, not the main topic. Furthermore, occasional comments by Elevator employees that HTAs were "good" or "win-win" propositions simply do not rise to the level of participating in creating a marketing plan for grain, such as was alleged in *Brown*. Therefore, as a matter of law, the court holds that

neither Geneva Elevator nor United Suppliers was "in the business" of supplying information about HTAs such that the Producers' negligent misrepresentation claim will lie. *Compare id.* Because the Producers' negligent misrepresentation claim fails on this initial element, which is committed to the court to determine "as a matter of law, in light of the facts," *id.*, the defendants are entitled to summary judgment on the Producers' negligent misrepresentation claim.

### D. Breach–Of–Contract Claims

Each side has asserted a claim or counterclaim that the other has breached the HTAs in question here. Geneva Elevator has moved for summary judgment on both the Producers' breach-of-contract claim and its own, asserting that the Producers have no damages to support their claim and that, as a matter of law, all but two of the Producers repudiated the HTAs, such that sixteen of the Producers cannot assert their own claim and only damages remain to be tried against those Producers on the Elevator's claim. The Producers counter that they can prove benefit-of-the-bargain damages, asserted to be the benefit of being able to roll out their HTAs indefinitely, to support their breach-of-contract claim and that there are genuine issues of material fact as to repudiation precluding summary judgment on either claim. In reply, the Elevator reiterates its contention that all but two of the Producers repudiated the HTAs as a matter of law and that there is no evidence that the Producers would have derived greater profits from ultimately delivering on their HTAs than from selling on the cash market, such that the Producers can prove no damages from being deprived of the opportunity to roll their contracts.

The Producers asserted at oral arguments that there has simply been no breach of the HTAs on their part, because the breach asserted by the Elevator is failure to deliver corn in July of 1996, but the contracts allowed them to roll past that delivery date. This argument mischaracterizes the Elevator's breach-of-contract claim: Count II of the counterclaim asserts that the Producers breached their HTAs *by repudiating them* in the June 18, 1996, letter, before performance by delivery was due, not by a failure to deliver grain in July of 1996. Counterclaim

¶ 31. Thus, the question is whether there is a genuine issue of material fact as to the Producers' repudiation of the HTAs.

### 1. Repudiation

The parties contest whether the Producers repudiated the HTAs within the meaning of Iowa Code § 554.2610, § 2–610 of the Uniform Commercial Code (U.C.C.). That code provision provides as follows:

### 554.2610. Anticipatory repudiation

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

a. for a commercially reasonable time await performance by the repudiating party; or

b. resort to any remedy for breach (section 554.2703 or 554.2711), even though the aggrieved party has notified the repudiating party that the aggrieved party would await the latter's performance and has urged retraction; and

c. in either case suspend the aggrieved party's own performance or proceed in accordance with the provisions of the Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (section 554.2704).

Iowa Code § 554.2610. The Iowa Supreme Court's most detailed consideration of proof of repudiation within the meaning of § 2–610 is in *Pillsbury Co. v. Ward*, 250 N.W.2d 35 (Iowa 1977). In that decision, the Iowa Supreme Court observed that "[t]o apply the foregoing section it is first necessary to determine whether [one party] repudiated the contract." *Pillsbury*, 250 N.W.2d at 40. However, because "[r]epudiation is not defined in the Code," the Iowa Supreme Court looked to the official comments to this section of the U.C.C. for guidance. *Id.* Those official comments provide,

1...... [A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear

determination not to continue with performance....

2. It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation. And, a repudiation automatically results under the preceding section on insecurity when a party fails to provide adequate assurance of due future performance within thirty days after a justifiable demand therefor has been made. Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance. However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.

Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 40 (quoting portions of the same official comment and citing decisions relying upon it); *Whewell v. Dobson,* 227 N.W.2d 115, 118 (Iowa 1975) (also quoting official comments from paragraphs 1 and 2 for a definition of repudiation and observing that "[t]he Uniform Commercial Code comments should be given due consideration as they express the intention of the drafters"). The Iowa Supreme Court found sufficient evidence of repudiation in Pillsbury's oral notice to Ward that it could not accept delivery of beans until the month following the delivery month specified in the contract. *Pillsbury,* 250 N.W.2d at 41.

However, the Iowa Supreme Court's analysis did not end there. The Iowa Supreme Court considered further whether Pillsbury's repudiation "substantially impaired the value of the contract to Ward," noting that "[o]nly if there was substantial impairment was Ward entitled to the remedies prescribed in § 554.2610." *Id.* In determining the meaning of substantial impairment, the Iowa Supreme Court again looked to the official comments to the U.C.C., which provide as follows:

3. The test chosen to justify an aggrieved party's action under this section is the same as that in the section on breach in installments contracts—namely the substantial value of the contract. The most useful test of substantial value is to determine whether material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated.

Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 41 (quoting the same official comment and citing decisions relying upon it). The Iowa Supreme Court found that Pillsbury's repudiation had substantially impaired the value of the contract to Ward, because the delayed delivery date subjected him to increases in the price of beans he would have to buy to make up his shortfall. *Id.*

The Eighth Circuit Court of Appeals, albeit applying Minnesota law, has articulated identical principles, also drawing upon the official comments to § 2–610 of the U.C.C.:

Anticipatory repudiation occurs only when one party expressly renounces a contract and announces an intention not to perform. *Jurek v. Thompson,* 308 Minn. 191, 241 N.W.2d 788 (1976). There must, at a minimum, be an "overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Official Comment to U.C.C. § 2–610(1), codified as Minn.Stat. § 336.2–610(1). A secret intention not to perform or a negative attitude does not rise to the level of repudiation. *Teeman v. Jurek,* 312 Minn. 292, 251 N.W.2d 698 (1977). If a party to a contract demands of the other party a performance to which he has no right under the contract and states definitely that, unless his demand is complied with, he will not render his promised performance, an anticipatory repudiation has been committed. 4 Corbin, Contracts § 973 (1951)....

... A suggestion for modification of a contract does not amount to a repudiation unless the party makes it clear that he will not perform without the modification.

*Unique Sys., Inc. v. Zotos Int'l, Inc.,* 622 F.2d 373, 376–77 (8th Cir.1980). The Eighth Circuit Court of Appeals also articulated sim-

ilar principles when applying Missouri law in *National Farmers Organization v. Bartlett & Co., Grain,* 560 F.2d 1350 (8th Cir.1977). In *National Farmers Organization,* the court considered whether a seller of grain had repudiated a contract for the sale and purchase of grain based on a seller's communication to the buyer that it " 'was not going to deliver any grain to [Buyer] on any of the 14 outstanding contracts between the parties unless and until [Buyer] paid [Seller] a substantial amount of money due on deliveries already made as of that date on' " three other contracts. *National Farmers Organization,* 560 F.2d at 1353. The question of whether this communication constituted an anticipatory repudiation of the contracts was "a difficult and close one." *Id.* at 1355. After quoting § 2–610 and the official comments to it quoted above, the court concluded that the portion of the comment that was of "foremost concern" was the one stating that " 'when under a fair reading [one party's statement] amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.' " *Id.* at 1357 (quoting Comment 2 to § 2–610). The court concluded that the statement announcing a refusal to deliver grain on one contract until some payment had been received on prior deliveries under other contracts "fairly read, amounts to a statement of intention not to perform future contracts except on conditions which go beyond those contracts," and hence constituted an anticipatory repudiation of the future performance of the contracts in question. *Id.*

A "fair reading" of the June 18, 1996, letter from the Producers does not establish as categorically as the Elevator asserts an intention on the part of the Producers who sent it not to perform the HTAs except on conditions that go beyond those of the contracts. *See* Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 40 (quoting this portion of the official comment); *Whe-*

well, 227 N.W.2d at 118 (also quoting this portion of the official comments); *Unique Sys., Inc.,* 622 F.2d at 376–77; *National Farmers Organization,* 560 F.2d at 1357. The letter certainly does suggest that the HTAs may be illegal; it certainly does describe the HTAs as "imaginary paper transactions"; and it does suggest that the Producers have no intention of being responsible for futures positions held by the Elevator. However, posturing over the legality of the contracts does not necessarily amount to a categorical assertion that the contracts are illegal and will not be performed for that reason. In short, it does not *as a matter of law* "demonstrate[ ] a clear determination not to continue with performance...," Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 40 (quoting this portion of the official comments defining repudiation); *Whewell,* 227 N.W.2d at 118 (same), nor does it "expressly renounce[ ][the] contract[s] and announce[ ] an intention not to perform," although it clearly expresses a "negative attitude." *Unique Sys., Inc.,* 622 F.2d at 376–77. Furthermore, the letter does not state that the Producers refuse to perform the HTAs except upon conditions not found in the contracts, although that is certainly one reasonable inference from its text. Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 40; *Whewell,* 227 N.W.2d at 118. Another reasonable inference from the first numbered paragraph, however, as the Producers have asserted, is that the Producers saw nothing to "work out," because they intended to continue performing under the HTAs, at least by continuing to roll them while it was to their advantage to do so.[3]

However, the Elevator has cited in its reply brief excerpts of deposition testimony of several of the Producers—Barz Dep. at 101, Jay Behn Dep. at 71, Bourquin Dep. at 59–60, Horner Dep. at 89, Lynn Reinke Dep. at 86, and Donald Swieter Dep. at 104—in

---

**3.** The court agrees with the Elevator that the Producers' assertion that the June 18, 1996, letter was an assertion of intention to perform under the "original contracts" is weak, perhaps even disingenuous, but the court's task at the summary judgment stage of the proceedings is

not to weigh the evidence, only to determine whether reasonable inferences contrary to the movant's assertions preclude summary judgment. *See, e.g., Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237.

which those Producers testified that they meant in the June 18, 1996, letter that they were not going to perform their HTAs or not going to perform them if they were required to pay "spreads" to roll. The Elevator asserted at oral arguments that it is entitled to summary judgment on its breach-of-contract claims at least as to these Producers, because they have clearly repudiated the HTAs as a matter of law. Although, this court would likely find the deposition testimony of these six Producers, explaining what they meant by the June 18, 1996, letter, was sufficiently categorical to hold that they meant to repudiate their HTAs, for the court to do so at the summary judgment stage of the proceedings would be for the court improperly to weigh the evidence, rather than to examine the evidence for genuine issues of material fact. *See, e.g., Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237. Genuine issues of material fact as to repudiation do indeed arise, despite the deposition testimony of these Producers, because the June 18, 1996, letter is ambiguous, and because their deposition testimony as to their intent in sending the letter was not contemporaneous with the actions alleged to constitute the repudiation. It is the Producers' actions *at the time* of the alleged repudiation that must "demonstrate[ ] a clear determination not to continue with performance...," Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 40 (quoting this portion of the official comments defining repudiation); *Whewell,* 227 N.W.2d at 118 (same), not their *post hoc* explanations of what they meant by their conduct at the time. Thus, summary judgment cannot be granted in the Elevator's favor even as to these six Producers on their liability for repudiating their HTAs.

### 2. Substantial impairment

■ However, even if the court could hold that some or all of the Producers repudiated their HTAs in the June 18, 1996, letter, this conclusion would fulfill only the first prong of the test of anticipatory repudiation under Iowa law: The Elevator must also demonstrate substantial impairment of the HTAs as the result of these Producers' refusal to pay spreads to roll. *Pillsbury,* 250 N.W.2d at 41. The Producers argue, first,

that refusal to deliver grain under contracts that always permitted them to roll delivery, and hence a refusal to make performance that would never come due, cannot substantially impair the value of the contracts. However, the Producers' argument once again overlooks the fact that there was always a price to be paid to exercise the right to roll, *i.e.,* paying the spread and the roll fee. Pursuant to the terms of the Type II backers, "A service charge of _____ per bushel will be assessed each time the contract is rolled forward, plus the spread trading at that time," and "[t]he spread service charge *is to be paid at the time the spread is initiated." See, e.g.,* Answer and Counterclaim, Exhibit E, Contract No. FO–001549 (January 17, 1994, by Diemer Bros.) (emphasis added). Similarly, Type III backers impose a spread payment and roll fee when the contract is rolled. *See, e.g.,* Answer and Counterclaim, Exhibit A, Contract No. FO–002390 (October 16, 1995, by Kevin Barz) ("The CBOT futures price as shown on this Addendum shall be adjusted by the differential between the two futures month[s] at the time of the "rollover". An additional service charge of _____ (corn) or _____ (beans) cents per bushel will be assessed by the Buyer each time the contract futures month is rolled forward."). Thus, a refusal to perform the HTAs at all, or a refusal to pay spreads to roll, even if rolling meant performance by delivery was never due, also meant a refusal to pay the spread and roll fees *due on each roll.*

Assuming, only for the sake of argument, that the Elevator could never expect delivery of grain, deprivation of the spread payments and roll fees every time the HTAs were rolled would deprive the Elevator of the only means whereby it could expect any benefit at all from the HTAs, and therefore leaves no genuine issue of material fact that deprivation of those spread payments and roll fees was a "material inconvenience or injustice" to the Elevator, even had it waited to receive performance "minus the part or aspect repudiated," the payment of spread payments and roll fees. Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury,* 250 N.W.2d at 41. Thus, if a jury finds that any of the Producers repudiated their

HTAs in the June 18, 1996, letter, there is no genuine issue of material fact that the value of the HTAs to the Elevator was substantially impaired by such a repudiation.

However, the Elevator is not entitled to summary judgment on its breach-of-contract claim against any of the Producers who sent the June 18, 1998, letter, nor against Meyer, who later retracted the letter. The court cannot find as a matter of law that Meyer's joining in the lawsuit for declaratory judgment of his rights under the HTAs constituted repudiation, or declaratory judgment actions to declare the requirements of contracts would be eviscerated. Nor can the court find, as a matter of law, that Bart Reinke repudiated the HTAs—although this is perhaps the closest question of all of the Producers—by refusing to deliver more than part of his annual production for one year on his outstanding HTAs. His actions leave a strong inference that he was refusing to perform except on conditions very different from those found in the contracts, Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury*, 250 N.W.2d at 40; *Whewell*, 227 N.W.2d at 118, and, for the reasons discussed above, such action would substantially impair the value of his HTAs to the Elevator. Iowa Code § 554.2610, Uniform Commercial Code Comment; *see also Pillsbury*, 250 N.W.2d at 41. However, a contrary inference, just barely generated by the record, is that Bart Reinke was only posturing in light of the pending declaratory judgment action, rather than refusing categorically to perform his HTAs. Thus, the Elevator is not entitled to summary judgment on the Producers' and its own claim of breach-of-contract on the ground of repudiation by the Producers as a matter of law, although the Elevator may well prevail on this ground at trial.

### 3. The Producers' damages

But can any of the Producers succeed on their own breach-of-contract claim by proving adequate damages, if a jury finds that they did not repudiate the contracts? The Producers argue that they can prove benefit-of-the-bargain damages, asserted to be the benefit of being able to roll out their HTAs indefinitely, to support their breach-of-contract claim. The Elevator, however, contends that there is no evidence that the Producers would have derived greater profits from ultimately delivering on their HTAs than from selling on the cash market.

The Iowa Supreme Court has explained "benefit-of-the-bargain" damages under Iowa law as follows:

> In Iowa, when a contract has been breached, the non-breaching party is generally entitled to be placed in a position that he or she would have occupied had there been performance. *Yost v. City of Council Bluffs*, 471 N.W.2d 836, 840 (Iowa 1991). In other words, these "benefit-of-the-bargain" damages are intended to provide a sum of money that will put the non-breaching party in the position that he or she would have been if the contract had not been breached. *See* 22 Am.Jur.2d *Damages* § 45, at 68–69 (1988). The focus of Iowa law is foreseeability of the type of damage. *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994). In *Kuehl*, we stated:
>
> > damages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement.... Damages which a reasonable person would expect to follow from a breach of a contract are direct and thus should be awarded.
>
> *Id.* (citations omitted).

*Magnusson Agency v. Public Entity Nat'l Company–Midwest*, 560 N.W.2d 20, 27 (Iowa 1997).

Although the Producers have not articulated their argument about the value of a lost opportunity to roll, it is readily apparent that, just as corn prices underwent an extraordinary rise in 1996, they could suffer a precipitate fall, such that the Producers could recover all spread payments and roll fees paid for past rolls and therefore could ultimately sell their corn pursuant to the HTAs at a price that would allow a profit above that available on a concurrent cash price sale. The question that should concern a jury is not so much whether this theoretical possibility exists, but whether it is entirely too speculative to serve as a basis for "benefit-of-the-bargain" damages. Nonetheless, there is a

jury question on whether the Producers can prove damages for any breach of the HTAs by the Elevator. That being so, the Elevator's motion to dismiss the breach-of-contract claims of the Producers must be denied on this secondary ground.

### III. CONCLUSION

The court concludes, first, that the various types of "backers" to the present HTAs do not turn what were otherwise valid cash forward contracts for the delivery of grain into illegal off-exchange futures contracts subject to the CEA. Therefore, the Elevator is entitled to summary judgment on Count I of the Producers' complaint and a declaration that the HTAs in question here are indeed valid cash forward contracts. Furthermore, the defendants are both entitled to summary judgment on the Producers' negligent misrepresentation claim. This claim fails on the initial element, proof that the defendants were "in the business" of supplying information about HTAs, which is an element committed to the court to determine as a matter of law, in light of the facts. At most, the record shows that on some isolated instances some vague or general information about HTAs was discussed by some employees of the defendants with some of the Producers. These occasional comments simply do not rise to the level of supplying information as part of a product or participating in the creation of the Producers' marketing plans.

The Elevator's motion for summary judgment on its own and the Producers' breach-of-contract claims, presents a closer question. The court cannot hold that any of the Producers repudiated their HTAs as a matter of law, although the alleged repudiation, supposed refusal to pay "spreads" and roll fees, undisputably substantially impaired the value of the HTAs to the Elevator. Genuine issues of material fact thus preclude summary judgment in favor of the Elevator on its breach-of-contract counterclaim. Also, genuine issues of material fact concerning repudiation and whether the Producers can prove damages preclude summary judgment on the Producers' breach-of-contract claims.

THEREFORE, the defendants' April 30, 1998, motion for partial summary judgment is

1. **Granted** as to Count I of the Producers' complaint, the declaratory judgment claim, and the court declares the HTA contracts at issue herein to be valid cash forward contracts as a matter of law;

2. **Granted** as to Count VI of the Producers' complaint, the state-law claim of negligent misrepresentation, and that claim is *dismissed;*

3. **Denied** as to Count VII of the Producers' complaint, the breach-of-contract claim; and

4. **Denied** as to Count II of the defendants' counterclaim, the breach-of-contract claim; as to the liability of the Producers for breach of contract.

**IT IS SO ORDERED.**